808 A.2d 838 (2002)
174 N.J. 381
In the Matter of the ESTATE OF Arthur J. ROCCAMONTE, Sr.
Mary Theresa Sopko, Plaintiff-Respondent,
v.
Doreen Slackman, Administratrix of the Estate of Arthur J. Roccamonte, Sr., Defendant-Appellant.
Supreme Court of New Jersey.
Argued September 10, 2002.
Decided October 23, 2002.
*840 Joel C. Seltzer, Union, argued the cause for appellant.
Michael J. Breslin, Jr., Hackensack, argued the cause for respondent (Waters, McPherson, McNeill, attorneys; James J. Seaman, Secaucus, on the brief).
*839 The opinion of the Court was delivered by PRESSLER, P.J.A.D. (temporarily assigned).
This palimony case brought by plaintiff Mary Sopko against defendant the Estate of Arthur Roccamonte is before us by reason of a dissent in the Appellate Division. R. 2:2-1(a)(2). The majority concluded as a matter of fact that a fair reading of the record in the trial court compelled the finding that decedent Roccamonte had made an enforceable oral promise of support for life to plaintiff Mary Sopko, his cohabitant for twenty-five years and with whom he had lived as husband and wife during that entire period and until his death in 1995. The majority also concluded as a matter of law that the promise was enforceable against his estate. The dissent was of the view that the trial court had failed to make a finding of that promise and, more significantly, that even if the promise had been made, it would not be enforceable against the estate. We agree with the majority's determination of both issues and accordingly affirm.
The undisputed facts and the facts as expressly found by the trial court are related in detail in Judge Kestin's majority opinion, 346 N.J.Super. 107, 787 A.2d 198 (App.Div.2001) (Roccamonte II), and in his prior opinion, 324 N.J.Super. 357, 735 A.2d 614 (App.Div.1999) (Roccamonte I), by which the Appellate Division reversed a summary judgment in favor of the estate dismissing plaintiff's complaint for support for life and remanded to the Chancery Division, Probate Part. We relate them here only to the extent necessary to explain our decision.
Plaintiff Mary Sopko was born in 1925. In 1941 she married Nicholas Sopko, who was then in the army and, following his war assignment, she returned alone to Bloomfield, New Jersey, obtaining employment as a model in New York City's garment center. When her husband returned from army service, they lived together in New Jersey, she continued to work, and in 1952, she gave birth to their daughter, Sandra. In the 1950's she met Arthur Roccamonte, the owner of a trucking business servicing the garment industry. He was also then married and had two children. Roccamonte pursued plaintiff, and they embarked on an affair that endured for the rest of his life. Plaintiff's husband left her, and she and Roccamonte lived together intermittently until the mid-1960s when she left New Jersey and went to California for the purpose of ending her relationship with Roccamonte, who had refused her requests that he divorce his wife and marry her. Roccamonte, however, wanted her to return, telephoned her repeatedly, and promised that if she came *841 back to him, he would divorce his wife and, so plaintiff asserts, he would provide for her financially for the rest of her life. Relying on his promises, she returned to New Jersey, divorced her husband, and took up residency in Glen Ridge.
In 1970 Roccamonte leased an apartment in an upscale building in Glen Ridge where he and plaintiff lived together as husband and wife. Plaintiff's daughter lived with them. In 1973 the building was converted to cooperative ownership, Roccamonte purchased an interest which he titled in plaintiff's name, and they lived together in that apartment as husband and wife until his death. He never divorced his wife, explaining to plaintiff that a divorce would place his business in jeopardy. He continued throughout his life to support his wife and children generously. Although Roccamonte was extremely private respecting his business affairs, indeed secretive, there is no doubt that he was a man of considerable wealth and that the lifestyle he afforded plaintiff and the financial support he provided her was consistent with his affluence. He paid for substantial improvements to the apartment, gave her cash of $600 a week, and bought her clothes and jewelry. They took frequent vacations and regularly dined at expensive restaurants. Roccamonte also supported plaintiff's daughter, paying her college tuition and medical expenses. Plaintiff continued to work in the garment industry until 1990, for a time as a model and later as a salesperson, earning a take-home pay, she testified, averaging about $250 weekly. During their years together, plaintiff committed herself to her relationship with Roccamonte, conducting herself in private and in public as a loyal and devoted wife.
As time passed and she grew older, plaintiff became increasingly concerned about her own financial future in the event that she survived Roccamonte. She expressed these concerns to him, and he repeatedly assured her, she testified, that she had no cause for worry as he would see to it that she was provided for during her life. He repeated that promise in the presence of others, including a friend of plaintiff, who so testified, and her brother, with whom the couple frequently visited, who also so testified. Roccamonte, however, died intestate. On his death, plaintiff received the proceeds of an insurance policy on his life in the amount of $18,000 and of a certificate of deposit in her name in the amount of $10,000. She also had title to the apartment, the maintenance cost of which was then approximately $950 per month, and her jewelry. She had, moreover, received two weekly payments of $1,000 immediately after Roccamonte's death from his son, who was managing the trucking business. She testified to her belief that these payments represented the periodic support Roccamonte had intended her to receive from the business after his death but the payments were characterized by Roccamonte's son as merely the proceeds of his father's last paycheck.
Not having been otherwise provided for and believing, therefore, that Roccamonte had failed to keep his promise to her of support for her life, plaintiff, in October 1995, some seven months after his death, commenced this palimony action against Roccamonte's estate seeking a lump-sum support award. For the next two years, the only issue before the court was whether the action belonged in the Chancery Division, Family Part, or the Chancery Division, Probate Part. As related by the Appellate Division in Roccamonte I, 324 N.J.Super. at 360-361, 363, 735 A.2d 614, it ultimately wound up in the Probate Part over plaintiff's protest, where defendant moved for and was granted summary judgment dismissing the complaint, the basis of which was the judge's perception of *842 plaintiff's failure to make a prima facie showing of a valid contract to make a testamentary disposition. In reversing that judgment, the Appellate Division pointed out that that issue was fact sensitive, precluding summary judgment. Writing for the court, Judge Kestin also opined that the trial court had failed to consider as an independent ground for the relief sought, and indeed the primary ground relied on by plaintiff, her entitlement to support on the palimony theory, that is, whether "she had a valid and enforceable contract claim with independent vitality, assertable against the decedent's estate as his successor in interest, apart from any testamentary qualities decedent's representations might have had...." Id. at 365, 735 A.2d 614. The court, therefore, remanded to the Probate Part for an evidentiary hearing on that issue, as well as the others raised.[1]
The Appellate Division judgment was rendered in August 1999. The plenary trial directed by the court commenced on January 11, 2000, and was continued on January 13, 2000. The next trial date was April 10, 2000, and the fourth and last on June 28, 2000.[2] The trial judge rendered his oral decision dismissing the complaint, for reasons we hereafter discuss, on September 25, 2000. Plaintiff's appeal from the memorializing order ensued, and Roccamonte II was decided in November 2001. The Estate's appeal as of right was argued before this Court on September 10, 2002. By that time seven and a half years had passed since Roccamonte's death. Plaintiff is now 77 years old, and her attorney represented to us that she has exhausted her assets and is living in poverty, dependent entirely on social security payments of under $1,000 a month and food stamps. She makes a home with her disabled daughter who is in receipt only of social security disability payments.
We address the proofs and the trial court's findings thereon respecting the first issue, whether an enforceable contract was made, in the context of what are now well-settled principles in this jurisdiction respecting the right of an unmarried person to enforce her cohabitant's promise to support her for life. In Kozlowski v. Kozlowski, 80 N.J. 378, 403 A.2d 902 (1979), we recognized that unmarried adult partners, even those who may be married to others, have the right to choose to cohabit together in a marital-like relationship, and that if one of those partners is induced to do so by a promise of support given her by the other, that promise will be enforced by the court.
We made clear in Kozlowski that the right to support in that situation does not derive from the relationship itself but rather is a right created by contract. Because, however, the subject of that contract is intensely personal rather than transactional in the customary business sense, special considerations must be taken *843 into account by a court obliged to determine whether such a contract has been entered into and what its terms are. To begin with, as we held in Kozlowski, 80 N.J. at 384, 403 A.2d 902, the palimony contract may be oral and usually is because "[p]arties entering this type of relationship usually do not record their understanding in specific legalese...." Ibid. The contract may also be express or implied. Consequently the existence of the contract and its terms are ordinarily determinable not merely by what was said but primarily by the parties'"acts and conduct in the light of ... [their] subject matter and the surrounding circumstances." Ibid. We thus concluded that a general promise of support for life, broadly expressed, made by one party to the other with some form of consideration given by the other will suffice to form a contract. Id. at 384, 403 A.2d 902. And if such a promise of support for the promisee's lifetime is found to have been made, without any further specification or elaboration of its terms, and that promise is broken, the court will construe and enforce it by awarding the promisee "a one-time lump sum ... in an amount predicated upon the present value of the reasonable future support defendant promised to provide, to be computed by reference to ... [the promisee's] life expectancy...." Id. at 385, 403 A.2d 902.
The facts that were before us in Kozlowski are instructive and, moreover, are remarkably similar to those here. There, both cohabitants were married to others when the defendant prevailed upon the plaintiff to leave her husband and, with her children, to live with him in a marital-type relationship. They lived together for fifteen years before he left her for another woman. During the term of that relationship, the defendant had become affluent and provided ample support for the plaintiff and her children. He too, like Roccamonte, refused to divorce his wife, and at some point, apparently for that reason, the parties separated. The defendant induced the plaintiff's return, however, promising to provide for her for the rest of her life if she did so. She capitulated, only to be abandoned by him nine years later. The trial judge, whose findings we quoted at length, found not only that the plaintiff was entirely dependent economically on the defendant but also that she had, during their intimate relationship, "perform[ed] services of value to the defendant, including housekeeping, cooking, food shopping, serving as his escort and companion and entertaining his business associates and customers as he desired." Id. at 382, 403 A.2d 902. We accepted the trial judge's conclusion that the defendant "did promise to take care of her for the rest of her life as she testified" and that "when she indicated concern about what would happen to her if he died first, he reassured her by telling her he would see that she was taken care of." Id. at 385, 403 A.2d 902. We held that those promises and assurances in the circumstances constituted a sufficient basis for finding that a contract had been made.
We next applied the Kozlowski principles in Crowe v. De Gioia, 90 N.J. 126, 447 A.2d 173 (1982), in which we granted leave to appeal from the Appellate Division's reversal of the trial court's grant of temporary relief pending trial to the plaintiff, who had lived with the defendant in a marital-type relationship for some twenty years before he left her for a younger woman. As in Kozlowski, she and her children were entirely dependent upon him, and she had relied on his promise to "take care of her and support her for the rest of her life...." Id. at 129, 447 A.2d 173. We also noted that the relationship was "akin to a marriage," and that "[i]n return for his support, she acted like his wife: cooking, cleaning, caring for him *844 when he was ill, helping in his various business ventures, and accompanying him socially." Ibid. We reaffirmed the principles we articulated in Kozlowski, held that temporary relief was available on a proper showing, and remanded for trial. The ensuing trial resulted in a judgment for the plaintiff awarding her a lump-sum payment predicated on the present value of reasonable support for her life based on tables of life expectancy.
The Appellate Division, by an opinion authored by Justice Long, then a judge of that court, affirmed. Crowe v. De Gioia, 203 N.J.Super. 22, 495 A.2d 889 (App. Div.1985), aff'd o.b., 102 N.J. 50, 505 A.2d 591 (1986). The Appellate Division found adequate support in the record for the trial judge's finding that defendant had expressly promised to support the plaintiff for life, a finding the trial judge articulated as follows:
Do I find that there was an express promise rather than an implied promise, or no promise at all? I believe there was an express promise. I so find.
I think that it's quite clear that this woman did not spend twenty years of her life socializing with this man, cooking for him, being his sex partner, without some type of express promise being given to her.
[203 N.J.Super. at 28, 495 A.2d 889.]
The Appellate Division also rejected the defendant's argument that there was insufficient consideration for the asserted promise. Noting that the amount and sufficiency of consideration is not significant as long as it is the bargained-for detriment and that the detriment incurred need not be equal to the benefit received fundamental contract principles with which we are in full accordJustice Long opined that the consideration found by the trial judge, including the plaintiff's making a home for the defendant, cooking for him, and acting as his social companion, was ample. 203 N.J.Super. at 31, 495 A.2d 889.
Despite the high degree of congruency in the facts of Kozlowski, Crowe, and this case, the Estate argues that even if a promise were made, it would fail for want of consideration. The Estate takes the position that because sexual favor as the sole consideration would render the palimony contract unenforceable as meretricious, the consideration, as in Kozlowski and Crowe must include domestic services, and plaintiff, it argues, was not required by Roccamonte to perform such services.[3] That argument, however, misperceives the fundamental point of our palimony cases. The principle we recognized and accepted is that the formation of a marital-type relationship between unmarried persons may, legitimately and enforceably, rest upon a promise by one to support the other. A marital-type relationship is no more exclusively dependent upon one partner's providing maid service than it is upon sexual accommodation. It is, rather, the undertaking of a way of life in which two people commit to each other, foregoing other liaisons and opportunities, doing for each other whatever each is capable of doing, providing companionship, and fulfilling each other's needs, financial, emotional, physical, and social, as best as they are able. And each couple defines its way of life and each partner's expected contribution to it in its own way. Whatever *845 other consideration may be involved, the entry into such a relationship and then conducting oneself in accordance with its unique character is consideration in full measure. There is no doubt that plaintiff provided that consideration here until her obligation was discharged by Roccamonte's death.
The Estate also argues that no valid palimony agreement could have been entered into because plaintiff was not entirely dependent economically on Roccamonte but was, rather, employed during most of the relationship. Although it is true that the plaintiffs in Kozlowski and Crowe were in fact entirely dependent, we see no reason why complete dependency is a sine qua non of a valid palimony agreement. The issue is, more pertinently, one of economic inequality, and the relevant question is whether the promisee is self-sufficient enough to provide for herself with a reasonable degree of economic comfort appropriate in the circumstances. If one of the partners is not economically self-sufficient, albeit a wage earner, the promise of support by the other is no less legally significant than if she were entirely economically dependent. The difference is only in the amount of promised support that must be fixed in order to reach a reasonable lump-sum payment.
In any event, we are dealing here with a woman whose income, when she was working, was barely at subsistence level, if that, in a relationship with a partner of financial substance. We note, illustratively, that his payment of the monthly maintenance fee on their apartment alone was roughly equivalent to her earnings. It is unlikely that plaintiff would not have taken steps to increase her own income had she been required to be self-supporting during the years of the relationship. Beyond that, at the time of their liaison, plaintiff had no young children at home requiring her care. Presumably she could have occupied her time with charitable work, with country-club membership and other entertainments, with polishing floors and furniture and otherwise "housekeeping," or, as she did, with a modestly-paying job related to her partner's business, which enabled them, as she testified, to travel to work together in New York City and engage in a social life there. The fact that plaintiff chose to be employed cannot reasonably be deemed to result in her forfeiture of the support promise in view of her modest salary, the gross disproportion between her economic means and her partner's, and the gross disproportion between her earnings and the standard of living provided by Roccamonte. In any event, plaintiff was seventy years old when Roccamonte died, was no longer working, and at that time was relying exclusively on him for her support.
The question then is whether the promise of support for life was actually made. As we have pointed out, the promise may be either expressed in words or implied by conduct or both. Regrettably, the trial judge misstated the palimony principles of Kozlowski and Crowe. He concluded, erroneously, as follows:
It would seem that in New Jersey to allow palimony it must be limited and must be narrowly applied and to be utilized only where there is an express agreement between the parties, almost complete dependency by one cohabitant on the other and the equitable element that one party has "tossed aside" the other unfairly.
We have already dealt with the judge's erroneous view respecting economic dependency, and we will address his erroneous view of the prerequisite of a "tossing-aside" element in our consideration of the survival of the promise after the promisor's death. What is relevant here is the trial judge's failure to consider whether *846 there was an implied contract. We are compelled to address the implied-contract question because of the ambiguity of the judge's finding with respect to an express contract. As both the Appellate Division majority and dissent pointed out, the judge did not find that there was not an express contract. But whether he affirmatively found that there was an express contract is uncertain. The closest he came in his oral opinion was this statement:
Nevertheless, Mary's complaint for permanent support is based on her argument that she relied on decedent's verbal promise "to take care of her" even after Arthur's death. The Court finds that this verbal promise does not entitle Mary to support on a theory of expressed or implied contract, unjust enrichment, a contract to make a Will, or even palimony.
The problem is that in context the phrase "this verbal promise" can mean either such a verbal promise as is alleged or this very promise having been made.
In our effort to resolve the ambiguity, we have scrutinized the record. We are compelled to conclude that the evidence permits no conclusion other than that the promise of support for life was made, if not expressly as it appears to have been, then, ineluctably, by implication, and we so find as a fact by the exercise of our original jurisdiction. R. 2:10-5. It is not disputed that Roccamonte's final break from his family and his marital-like relationship with plaintiff resulted from his successful efforts to induce plaintiff's return to him after she had moved to California to make a new life for herself because she had despaired of Roccamonte's willingness ever to divorce his wife and marry her. There is no reasonable inference that can be drawn from her abandonment of that plan at his insistence and the resulting reunion other than that she relied on his representations, express or implied, that her future would be neither prejudiced nor compromised. It is also beyond dispute that Roccamonte was concerned for plaintiff's economic well-being and provided for her lavishly during their twenty-five years together as well as during the first extended period of their relationship. In the circumstances and in view of the proofs, it appears highly unlikely that he intended to leave her to an impoverished old age or that she took the risk, when she reunited with him, of an impoverished old age. The promise, clearly implied, if not express, that he would see to it that she was adequately provided for during her lifetime, whether or not she survived him, seems to us to have been both the corollary for and the condition of their relationship for the last quarter century of Roccamonte's life.
The novel issue that we have not heretofore addressed is whether the promise of support for life is enforceable against the promisor's estate. As a conceptual matter, it is no different from enforcement of any other contract, other than a contract for personal services, made by a decedent during his lifetime, Restatement (Second) of Contracts § 262 comment b (1981), and we are in agreement with Judge Kestin's cogent analysis in this regard. 346 N.J.Super. at 120-122, 787 A.2d 198.
We are satisfied that the personal-service exception does not apply in the circumstances here. In sum, the rule articulated by the Restatement formulation is that "[i]f the existence of a particular person is necessary for the performance of a duty, his death or such incapacity as makes performance impracticable is an event the non-occurrence of which was a basic assumption on which the contract was made." Id. § 262. Our courts have adopted that rule. Thus, in Siesel v. Mandeville, 140 N.J. Eq. 490, 492, 55 A.2d 167 (1947), Judge Jayne explained that:

*847 So, also, a contract may be of such a nature as to admit only of a personal performance or as to project the implication that it is to be operative only during the continuance of personal relations, although not so expressed in terms, and it will be deemed dissolved by death or other disability which renders its performance impossible according to the evident intention.
See also Salvemini v. Giblin, 42 N.J.Super. 1, 5, 125 A.2d 732 (App.Div.1956), aff'd, 24 N.J. 123, 130 A.2d 842 (1957); Seitz v. Mark-O-Lite Sign Contractors, Inc., 210 N.J.Super. 646, 652, 510 A.2d 319 (Law Div.1986).
Had plaintiff died first, the duty of Roccamonte to support her for life would have been fulfilled and discharged. Just as clearly, the obligations she assumed were discharged upon his death because her continued performance was thereby rendered impossible. Of course, the discharge of obligation in either case was within the parties' contemplation. But the obligation undertaken by Roccamonte to support plaintiff for life if she were the survivor is another matter altogether. It obviously cannot be said that termination of his obligation in the event of his death and her survival was within the parties' contemplation. Indeed, the intention of the parties appears to have been exactly to the contrary. Moreover, Roccamonte's promise of support was not a promise to perform personal services. It was a promise intended to provide financial compensation to plaintiff for keeping to her bargain until the discharge of her obligations. She did so, and is therefore entitled to the monetary benefit of that bargain. Roccamonte's duty to provide that benefit was, therefore, not discharged by his death and must, consequently, be discharged by his estate.
Moreover, because of the enforcement methodology we devised in Kozlowski, namely a lump-sum payment to the promisee representing the present value of reasonable future support calculated from the date of its termination and on the basis of the promisee's life expectancy, it matters not when the calculation is made in terms of the promisor's life because it is the promisee's life that is, in effect, the measuring life. That is to say, the promise is enforceable against the promisor as a consequence of its being broken. It is broken when support ceases. From the point of view of the promisee, who has fully performed her obligations, the reason support ceases is of no significance provided the promisor, or his estate standing in his stead, retains the financial ability to provide support. Whether the promisor, during his lifetime, breaks the promise by "tossing aside" the promisee without making adequate provision for her or dies without having made adequate inter vivos provision for her, she is in the same position, namely, without the support she bargained for. The point is simply that it is not the promisor's death that triggers her entitlement but rather his failure, during his lifetime, to have made adequate provision for the promisee, an obligation whose fulfillment does not depend solely or exclusively on testamentary disposition. As such, the promise is neither a gratuitous promise nor a contract to make a will and is not subject to defeat on that basis. It is simply a contractual undertaking binding the estate like any other contractual commitment the decedent may have made in his lifetime.
The dissenter in the Appellate Division acknowledged that palimony is not alimony, is not intrinsic to an extramarital cohabitation, and is based solely on contract principles. He took the view, however, that as a social, rather than as a legal, *848 matter, a palimony promise should not survive the promisor's death because the palimony promisee would then be in a better position than that of a divorced wife whose right to receive alimony ceases upon the obligor's death. It is true that the right to alimony terminates with the obligor's death. That is expressly provided for by N.J.S.A. 2A:34-25. But N.J.S.A. 2A:34-25 also provides that notwithstanding that consequence, the court may, in entering the judgment of divorce, order a spouse to maintain life insurance "for the protection of the former spouse." Thus, the function of alimony can be maintained after the obligor's death by substituting insurance proceeds, and such a provision is commonly made in property settlement agreements as well. Moreover, if the obligor spouse is unable, by reason of age or ill health, to obtain insurance, we have held that the court may, in lieu of ordering insurance, direct the establishment of an inter vivos trust to accomplish the same purpose. Jacobitti v. Jacobitti, 135 N.J. 571, 641 A.2d 535 (1994). When we take into account as well the equitable distribution to which a former spouse is entitled and a palimony promisee is not, we are persuaded that the premise of the dissent is flawed and that our disposition is proper.
Although we agree with the Appellate Division that a remand is necessary for the fixing of the lump-sum payment to which plaintiff is entitled, we are constrained to address the question of the appropriate forum in which the remand proceedings should be conducted. In Crowe v. De Gioia I, we concluded that because a palimony claim is essentially a contract claim, the Law Division would be the appropriate forum, where, as here, money damages alone are sought. We also opined, however, that where equitable relief is sought in addition to money damages, the Chancery Division would be the appropriate forum. 90 N.J. at 138, 447 A.2d 173. In 1983, subsequent to our decision in Crowe, Article VI, § 3, ¶ 3 of the New Jersey Constitution was amended to create the Family Part, and the court rules were extensively amended by the adoption, effective December 31, 1983, of a wholly revised Part V of the rules governing practice in that court. As part of that revision, the allocation of business to the Family Part was significantly broadened from that previously assigned to the matrimonial arm of the Chancery Division. That allocation included "[a]ll civil actions in which the principal claim is unique to and arises out of a family or family-type relationship...." R. 5:1-2(a). Because palimony claims typically are unique to a family-type relationship, the Family Part is where they should be brought, and the Appellate Division has indeed so held. Olson v. Stevens, 322 N.J.Super. 119, 123, 730 A.2d 432 (App.Div.1999). Moreover, probate actions involving or arising out of a family or family-type action have been held to be within the cognizability of the Family Part as well. See, e.g., Kingsdorf v. Kingsdorf, 351 N.J.Super. 144, 159, 797 A.2d 206 (App.Div.2002); Berlin v. Berlin, 200 N.J.Super. 275, 278-279, 491 A.2d 63 (Ch. Div.1984). Accordingly, we are satisfied that plaintiff's initial choice of that forum was correct.
We have recognized that Family Part judges have developed a special expertise in dealing with family and family-type matters, Cesare v. Cesare, 154 N.J. 394, 412-413, 713 A.2d 390 (1998), and, surely, fixing levels of support is an adjudicatory task well within that special expertise. Because proofs will be required, we remand to the Family Part for the fixing of a lump-sum payment. With respect to the amount to be fixed, it is clear that it must be made on the basis of plaintiff's life expectancy at the time of Roccamonte's *849 death. We leave to the trial judge the determination of an appropriate level of support in the circumstances and the resolution of such questions as whether the Estate is entitled to a credit on the lump-sum payment for the amount of the certificate of deposit in plaintiff's name, the life insurance proceeds, and her receipt of social security benefits.
There is one final matter. In Crowe v. De Gioia I, we approved the granting of temporary relief in palimony claims where the plaintiff's need is urgent and the probability of success high. Plaintiff has already succeeded in proving her right to support. Only the amount remains undetermined. In the event of any prospect of delay in the conduct of the remand proceedings, plaintiff may seek temporary periodic support from the Estate if she is in the need therefor represented to us, the total amount of which, if granted, shall be deducted from any lump sum awarded.
The judgment of the Appellate Division is modified to require the remand proceedings to be conducted in the Family Part. In all other respects it is affirmed.
For affirmanceChief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI and PRESSLER7.
OpposedNone.
NOTES
[1] In addition to the theory of contract to make a will, plaintiff urged, alternatively, theories of unjust enrichment and quasi contract. The trial judge on the remand proceedings rejected all of these alternate theories, and that rejection was affirmed in Roccamonte II by both the majority and the dissent. 346 N.J.Super. at 113, 122, 787 A.2d 198. Those issues are, therefore, not before us as of right, R. 2:2-1(a)(2), and plaintiff has not sought certification in that respect. Nor is the issue of counsel fees before us.
[2] Although the absence of a jury in Chancery Division matters enables flexibility in scheduling, nevertheless sporadic, intermittent scheduling such as occurred here frustrates both the legitimate interests and expectations of the parties and the systemic goal of the orderly and expeditious conduct of litigation. We adopted R. 5:3-6 in 1999 to require, insofar as practical, continuous trials in the Family Part, and that same procedural rule should apply to all Chancery actions, but most particularly to family-type actions such as this one.
[3] The Estate was apparently relying on the trial judge's observation that:

It should be remembered Mary never viewed her support by Mr. Roccamonte as being conditioned upon her performance of household duties or other wifely services for him. She indicated that he was like her husband and he took care of her, but offered no evidence of consideration on her part.