891 A.2d 1218 (2006)
383 N.J. Super. 347
Annette McDONALD, Plaintiff-Appellant,
v.
ESTATE OF GEORGE MAVETY and Phillip Percy Mavety, Executor of the Estate of George Mavety, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued January 10, 2006.
Decided February 23, 2006.
*1220 George T. Daggett, Sparta, argued the cause for appellant (Daggett, Kraemer, Eliades, Vanderwiele & Ursin, attorneys; Mr. Daggett, on the brief).
Donald R. Belsole, Morristown, argued the cause for respondents (Belsole and Kurnos, attorneys; Mr. Belsole, on the brief).
Before Judges COBURN, LISA and S.L. REISNER.
The opinion of the court was delivered by
LISA, J.A.D.
After a bench trial, a final judgment was entered dismissing the palimony complaint of plaintiff, Annette McDonald, against the Estate of George Mavety. Plaintiff filed a motion for a new trial based upon the trial evidence, and then supplemented that motion with information pertaining to newly discovered evidence. The new information was that during the pendency of the palimony litigation, a witness called by the defense in the palimony trial, Nick Meintanas, had filed a suit against a company owned by George Mavety and against Mavety's attorney, Debra L. Nicholson, who was also called by the defense as a witness in the *1221 palimony trial. The judge denied the motion but granted plaintiff a limited post-trial discovery period to further develop the asserted newly discovered evidence. Plaintiff did not avail herself of the opportunity, but instead filed this appeal.
On appeal, plaintiff raises these arguments:
POINT I
THE TRIAL COURT ERRED BECAUSE ITS VIEW OF THE STANDARDS GOVERNING "PALIMONY" WERE OVERLY NARROW.
POINT II
THE COURT BELOW IMPOSED A BURDEN OF PROOF ON THE PROMISE WHICH WAS ERRONEOUS AND THE COURT BELOW DID NOT INDICATE WHAT BURDEN OF PROOF IT EMPLOYED ON THE ISSUE OF COHABITATION.
POINT III
THE FAILURE OF THE ESTATE OF GEORGE MAVETY AND HIS REPRESENTATIVES TO INFORM THE COURT AND COUNSEL OF THE PENDING NICK MEINTANAS LAWSUIT REQUIRES A NEW TRIAL.
POINT IV
THE COURT BELOW DREW INFERENCES THAT ARE NOT SUPPORTED BY CASE LAW OR THE RULES OF EVIDENCE.
We reject these arguments and affirm.

I
George Mavety died at the age of sixty-three on August 19, 2000. He was a successful businessman, and his estate was valued between $21 and $36 million. He had been married three times, and at the time of his death, had been married to his third wife, Gertrud (Trudy), for about thirty years. Mavety and Trudy lived in a home, purchased at about the time of their marriage in 1970, on Stanhope Road, Sparta. However, in the 1980s, Mavety was involved in a relationship with Kyung Soon Nam, also known as "Miss Windy." In the 1980's, Mavety lived in New York City during the week, staying in an apartment with Miss Windy, and in Sparta on weekends. Mavety and Trudy separated in 1989. Mavety moved out of the Stanhope Road home and moved into a home he purchased at 24 Cherokee Court in Sparta.
Mavety continued to provide for Miss Windy. He provided her with an apartment in New York, and later, in 1999, purchased a home in West Orange for her to live in. He continued regular contact with Miss Windy and continued to provide for her until his death.
Mavety met plaintiff in January 1990. He was then fifty-three years old and she was twenty-four. She had a son, Earl Chaing, from a prior relationship. The relationship between plaintiff and Mavety became intimate. In June 1991, plaintiff gave birth to Mavety's son, Brandon, who died immediately after his birth. On December 9, 1993, plaintiff gave birth to Mavety's son, Chad Austin Mavety.
In early 1991, a company owned by Mavety, MMG Services, Inc., purchased a home at 8 Westgate Drive in Sparta, for plaintiff to live in with her son Earl, and later with Chad Austin. This home was about a ten minute drive from Mavety's home on Cherokee Court. In 1996, Mavety purchased another home in Sparta, at 16 Cheyenne Trail, to which plaintiff and her sons moved. The Cheyenne Trail home was in short walking distance to Mavety's Cherokee Court home.
Throughout this time, Mavety maintained an apartment on West 56th Street in Manhattan, and he continued to live *1222 there on a regular basis during the week. He typically spent his weekends in Sparta. In 1999, Mavety purchased a large mansion on a twenty-six acre estate at 200 Andover-Mohawk Road in Andover. He sold the Cherokee Court home, and when he was not in New York, stayed at the Andover mansion.
Mavety resolved not to divorce Trudy. He did not wish to go through an equitable distribution of property, which would, in all likelihood, result in Trudy receiving one-half of their assets, and which would be disruptive to his business and real estate interests. He continued to provide support to Trudy and visited her on holidays until his death. Everyone in the community was aware that Mavety and Trudy were husband and wife.
According to plaintiff, in September 1990, while driving to the Bronx, Mavety told her that he could not marry her because of his unwillingness to end his marriage with Trudy, but that he would take care of her for the rest of her life if she would spend it with him. Plaintiff contends she accepted the offer and moved several months later to the Westgate Drive home. It is this alleged promise and the subsequent conduct of the parties that formed the basis of plaintiff's palimony claim.
There is no dispute that during the ten-year relationship between plaintiff and Mavety, members of the community and friends and associates of the parties knew that Mavety was married to Trudy, but that he had a relationship with plaintiff. Plaintiff accompanied Mavety to social events and sometimes traveled with him. It was commonly known that plaintiff lived in the homes, first at Westgate Drive and then Cheyenne Trail, provided for her by Mavety, that he spent some time there with her on weekends, and, of course, that they had a child together. It was also well known and undisputed that Mavety loved his son, Chad Austin, and had a close relationship with him. Likewise, Mavety had a deep affection for plaintiff, and sometimes referred to her as "the love of my life." There was some conflict in the testimony as to whether the vitality of that affection continued in the later years of the relationship. Some witnesses testified that Mavety felt the relationship had soured and he would have preferred to end it, but did not do so because of his relationship with Chad Austin, and also, to some extent with plaintiff's other son, Earl.
The critical issues to be determined in the palimony trial were whether plaintiff and Mavety lived together in a marital-type relationship and whether Mavety, either expressly or impliedly, did indeed promise plaintiff that he would provide support for her for the rest of her life. If those questions were answered in the affirmative, it would then be necessary to determine whether plaintiff gave adequate consideration in exchange for the promise and the amount required in a present-value lump sum payment to satisfy Mavety's obligation.
The parties presented many witnesses who described the living arrangements and lifestyle of Mavety and plaintiff. Evidence was also presented regarding Mavety's 1994 will and 1998 codicil. Detailed information and records regarding Mavety's travel over the ten-year period of his relationship with plaintiff were also presented.
In his 1994 will, Mavety made certain specific bequests, with the entire balance of his estate to be held in a marital trust for Trudy's benefit during her lifetime. The specific bequests included (1) $400,000 in trust for plaintiff, to pay her a monthly sum of $2,500 so long as she remained unmarried and did not cohabit with another male; (2) $50,000 to Earl Chaing; (3) $100,000 to Chad Austin; and (4) *1223 $50,000 to Miss Windy. The 1998 codicil, prepared by Nicholson at Mavety's direction, made these changes: (1) the $400,000 trust for plaintiff was replaced with an outright bequest of $200,000; (2) the bequest to Miss Windy was increased from $50,000 to $500,000; (3) the bequest to Chad Austin was increased from $100,000 to $1,500,000; (4) the Cheyenne Trail home was devised to Chad Austin, with a specific provision that plaintiff and Earl could live there with Chad at no cost; and (5) the bequest to Earl was increased from $50,000 to $100,000.
Regarding living arrangements, it was undisputed that Mavety purchased and held title to homes provided for plaintiff's use and maintained housekeeping and nanny services for her. Early in their relationship, Mavety assisted plaintiff in completing college and even hired a tutor to assist her. Mavety also subsidized a business venture for plaintiff. At the time of trial, plaintiff was employed and in good health.
Plaintiff contended that she and Mavety lived together over the ten years in a marital-type relationship. Because of Mavety's wealth, she has argued that their living arrangements were not traditional, but, as wealthy people often do, they lived together in multiple residences. Referring to herself, her sons, and Mavety, plaintiff testified that "we all lived together" at all of the residences, "sometimes during the week" but "always on weekends." The estate contended that at all times during their relationship Mavety and plaintiff lived separately. Indeed, the estate presented testimony that Mavety frequently told friends and associates he preferred to live alone, a lifestyle he established before meeting plaintiff, and if he wanted to live with anyone he would resume living with Trudy. It was the estate's contention that Mavety and plaintiff were engaged in a dating relationship and each visited the other at their separate residences on occasion.
The trial spanned eight days between June 17, 2002 and June 27, 2002. On November 7, 2003, Judge Russell issued a forty-one page written decision and entered an order in favor of the estate, dismissing the complaint. In her decision, the judge thoroughly and carefully analyzed the testimony of each witness. We have reviewed the record, and we are satisfied that, contrary to the arguments advanced by plaintiff, the judge's assessment of the testimony was balanced and fair. In making credibility findings, the judge considered the demeanor of the witnesses, the nature and extent of inconsistencies in their testimony, and the extent to which their testimony was corroborated or contradicted by other evidence found reliable. The judge found plaintiff's testimony incredible, fraught with significant exaggerations and contradictions.
Regarding the issue of cohabitation, the judge summed up the testimony of plaintiff's witnesses thusly:
In sum, plaintiff brought forth multiple witnesses who had seen plaintiff and Mavety together, however, none of the witnesses corroborated plaintiff's testimony that they "lived together" at all "their homes." Rather, the cumulative testimony established that they always lived separate and apart, with Mavety generally visiting with [plaintiff] on Saturday, primarily at the homes he purchased and provided for her. The fact that plaintiff and decedent may have been together on particular occasions at any one of the homes owned by Mavety does not really speak to the cohabitation issue, but rather was to be expected given their ongoing dating relationship.
*1224 The judge found more persuasive the evidence that the parties did not live together. For example:
The court also found defense witness Mary Hock (hereinafter "Hock") very matter of fact and credible. Commencing in 1995, she was employed as Mavety's housekeeper at Saw Mill, then at Cherokee three or four days a week, and later at the Andover house only one or two days a week after the new housekeeper Stella was hired. Hock never saw any evidence that anyone else lived with him at Cherokee or at Andover.
During the five years she worked for Mavety, Hock saw [plaintiff] at Mavety's home "very rarely," "a few times, if that." Mavety did not allow anyone in his home without his permission and [plaintiff] did not have a key to Cherokee or Andover, thus Hock would be told in advance if [plaintiff] was coming so that Hock could let her in. [Plaintiff] did not even have a toothbrush there.
And:
In addition to the considerable body of credible testimony indicating that the parties always resided apart from one another, there is evidence supporting that position generated by the decedent himself, namely the April 20, 1998 application Mavety filled out to gain admission for Chad to the Hilltop Country Day School. Within the form (D-3) he set forth Chad's address as the Cheyenne house, his own address as the Cherokee house and he checked the box indicating that the applicant Chad "lives with (his) mother," rather than the box indicating that Chad "lives with both parents."
The judge found that "the parties did not cohabit at any time, rather they lived separate and apart throughout their relationship, with Mavety visiting [plaintiff] at the homes he provided for her, and [plaintiff] occasionally visiting Mavety at his other homes."
In an effort to establish that the parties had a marital-type relationship, in the fashion of wealthy people, plaintiff testified that she traveled extensively with Mavety. She told her economic loss expert that she traveled with Mavety an average of six to eight times per year on trips to various parts of the world averaging seven to twenty-one days each. After a careful analysis of all of the evidence presented on the subject, including documentary evidence and business records, the judge found plaintiff's claims grossly exaggerated. The judge also found that Mavety more often than not traveled without plaintiff. The judge stated:
From the body of evidence, the court finds that Mavety and [plaintiff] traveled together three times in the years 1990, 1991, and 1992; two times in the years 1996 and 2000; one time in the years 1994 and 1997; and not [at] all in the years 1993, 1995, 1998, and 1999.
The court finds from the total body of evidence that plaintiff's travel with Mavety most certainly did not involve six to eight trips or 98 days of travel yearly, and that plaintiff intentionally vastly exaggerated the entire travel situation in order to enhance her economic loss claim and to bolster her palimony claim that she and Mavety "traveled the whole world exclusively together." From the body of evidence the court finds that they traveled together approximately twice a year, and that Mavety traveled extensively with others, including Miss Windy, thus there was no "exclusive" quality to their travel.
The judge made a factual finding that Mavety did not make an express or implied promise to care for plaintiff for the rest of her life. The judge summed it up this way:

*1225 Plaintiff as a witness provided vague, halting and often contradictory testimony. Much of her testimony was not corroborated by her witnesses. Having addressed plaintiff's lack of credibility on the topics of cohabitation, travel and financial contributions, the court finds that her general lack of candor and pattern of economic exaggeration lend little support to her contention that Mavety made an express representation to her of life-time support. The court finds that plaintiff failed to meet the burden of proof to establish by clear and convincing evidence that such a promise was made.
Counsel for plaintiff argued in summation that the promise, whether expressed or implied, was proven by substantial performance, in that Mavety met all of [plaintiff]'s financial needs. This argument fails, as Mavety provided, in a very similar manner, for not only [plaintiff], but also Trudy and Miss Windy. Payment as to Trudy and Miss Windy was voluntary, a reasonable inference arises that payment to [plaintiff] was also voluntary on Mavety's part and unrelated to an express promise or implied promise. That Mavety viewed it that way is reflected in the careful records kept as to the amount spent on each of the women. The court finds that credible evidence does not support plaintiff's contention that Mavety made an express promise to her of life-time support, nor can a promise be implied from his conduct.
The judge found persuasive that the arrangements contained in the 1994 will and 1998 codicil, executed by Mavety during his relationship with plaintiff, and after the alleged promise to support her for life, set forth a contrary arrangement. The judge noted that "plaintiff conceded that decedent had urged her to go to Nicholson's office to read his will and codicil, thus the contents of same could have been known to her during Mavety's lifetime, and any deficiencies or deviations from his actual donative intent could have been addressed prior to his death." Plaintiff chose not to review the documents, which were made available to her. Those documents provided generously for her and her son by Mavety.

II
An appellate court plays a limited role in reviewing the findings on which a trial judge has based a judgment entered in a non-jury case. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). The court will "not disturb the factual findings and legal conclusions of the trial judge unless . . . they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ibid. (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J.Super. 154, 155, 188 A.2d 43 (App. Div.), certif. denied, 40 N.J. 221, 191 A.2d 61 (1963)). "Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Ibid. (citation omitted). "That the finding reviewed is based on factual determinations in which matters of credibility are involved is not without significance." Ibid. (citation omitted). "[G]reat weight is given to the finding upon questions of fact made by the court below because it hears the case, sees and observes the witnesses and hears them testify and has better opportunities to judge their credibility than the reviewing court." Capozzoli v. Capozzoli, 1 N.J. 540, 543, 64 A.2d 440 (1949). We are satisfied that Judge Russell's credibility and factual findings are well supported by the record, and we have no occasion to disturb them on appeal.

*1226 III
Plaintiff argues that the judge erred in applying an overly narrow view of the standards governing palimony. She claims that rather than view the arrangement between herself and Mavety as the "intensely personal" relationship she claimed, the judge considered them nothing more than "two people purchasing or selling a car" and applied formal and mechanical standards. We do not agree.
The fundamental principle upon which courts decide palimony cases is that "the formation of a marital-type relationship between unmarried persons may, legitimately and enforceably, rest upon a promise by one to support the other." In re Estate of Roccamonte, 174 N.J. 381, 392, 808 A.2d 838 (2002). "[T]he right to support in that situation does not derive from the relationship itself but rather is a right created by contract." Id. at 389, 808 A.2d 838. A palimony contract may be oral and may be either express or implied. Ibid. (citing Kozlowski v. Kozlowski, 80 N.J. 378, 384, 403 A.2d 902 (1979)). Its existence and terms "are ordinarily determinable not merely by what was said but primarily by the parties' `acts and conduct in the light of . . . [their] subject matter and the surrounding circumstances.'" Ibid. (quoting Kozlowski, supra, 80 N.J. at 384, 403 A.2d 902). "[A] general promise of support for life, broadly expressed, made by one party to the other with some form of consideration given by the other will suffice to form a contract. . . . [even] without any further specification or elaboration of its terms . . . ." Id. at 389-90, 403 A.2d 902 (citing Kozlowski, supra, 80 N.J. at 384-85, 403 A.2d 902). When the court is satisfied that such a promise was in fact made, and subsequently broken, it will award the promisee "`a one-time lump sum . . . in an amount predicated upon the present value of the reasonable future support [the promisor] promised to provide, to be computed by reference to . . . [the promisee's] life expectancy.'" Id. at 390, 403 A.2d 902 (quoting Kozlowski, supra, 80 N.J. at 385, 403 A.2d 902).
A critical element of a palimony claim is cohabitation for a significant period of time. Another panel of this court has recently reiterated, after analyzing the holdings in Roccamonte, Crowe, and Kozlowski, that failure to prove cohabitation in a marital-type relationship is fatal to a palimony claim. Levine v. Konvitz, 383 N.J.Super. 1, 2, 890 A.2d 354 (App.Div.2006). A long-term intimate romantic relationship unaccompanied by actual cohabitation will not suffice. Id. at 11, 890 A.2d 354.
Plaintiff argues that Judge Russell erred by insisting upon the traditional kind of one-household living arrangement that the parties in Roccamonte, Crowe and Kozlowski exhibited. The parties here, according to plaintiff, lived a different kind of lifestyle because of their affluence, and thus cohabited in multiple locations. We find this argument unpersuasive. While it is possible for an affluent couple to simultaneously own and live in more than one residence, all the while dedicating themselves to each other and to their relationship in the same manner as if they were married, the facts here do not support such a conclusion.
Mavety lived alone by choice. He spent his weekdays living at his Manhattan apartment by choice. Indeed, he maintained offices in New Jersey and frequently commuted from New York to New Jersey for his business activities. Although the homes in which he lived at Cherokee Court and Andover were in close proximity to those in which plaintiff lived at Westgate Drive and Cheyenne Trail, Mavety, *1227 again by choice, insisted upon separate households for himself and plaintiff.
This is not like Crowe, for example, where defendant worked as the night manager for motels and routinely kept a room at his job where he would spend the night. Crowe, supra, 203 N.J.Super. at 27-28, 495 A.2d 889. Under those circumstances, the fact that the defendant did not regularly sleep at the home where the plaintiff lived did not defeat cohabitation because the defendant "could not have cohabited with [the plaintiff] any more completely even if they had been married." Id. at 33, 495 A.2d 889. That is not the case here. Mavety and plaintiff had a romantic relationship, but Mavety continued, by choice, not necessity, to live separately and spend some limited time with her occasionally at a home he provided for her, at one of his homes, or on an occasional trip.
Plaintiff argues that cohabitation in the present day, with more liberal social standards, should be viewed more broadly than in the days of Kozlowski (1979) and Crowe (1986). Plaintiff relies on the Court's more recent pronouncement in Roccamonte (2002), pointing to the passage we previously quoted, that "the existence of the contract and its terms are ordinarily determinable not merely by what was said but primarily by the parties' `acts and conduct in the light of . . . [their] subject matter and the surrounding circumstances.'" Roccamonte, supra, 174 N.J. at 389, 808 A.2d 838 (quoting Kozlowski, supra, 80 N.J. at 384, 403 A.2d 902). However, the Court was merely reiterating and quoting the principles laid down twenty-four years earlier in Kozlowski.
We do not disagree that every arrangement between every couple is fact-sensitive and indeed "intensely personal." However, a palimony cause of action continues to require actual cohabitation in a marital-like relationship. That continues to require living together in a household or households under the same roof or roofs on a regular basis as dictated by the circumstances. That did not occur here. The judge applied the correct principles of law on this element of palimony to the facts as she found them.

IV
Plaintiff complains that the trial judge erred by applying the clear and convincing standard of proof pursuant to the "Dead Man's Statute." N.J.S.A. 2A:81-2. That statute requires such proof where a claim "supported by oral testimony of a promise, statement or act" of a deceased party underlies the claim against that party. Ibid. Plaintiff points out that the headnote of the section is "Transactions with lunatic or decedent; proof required." She argues that the section is meant to apply only to commercial or other impersonal "transactions" not to the "intensely personal" relationship involved in a palimony claim. We reject this argument.
It is clear that a palimony claim "is simply a contractual undertaking binding the estate like any other contractual commitment the decedent may have made in his lifetime." Roccamonte, supra, 174 N.J. at 397, 808 A.2d 838. The clear language of N.J.S.A. 2A:81-2 applies to the claim. The headnotes attributed to our codified statutes are not the product of legislative action. N.J.S.A. 1:3-1; State v. Darby, 246 N.J.Super. 432, 440-41, 587 A.2d 1309 (App.Div.), certif. denied, 126 N.J. 342, 598 A.2d 898 (1991). Therefore, the headnotes are not deemed part of the legislation itself and do not assist in statutory interpretation. N.J.S.A. 1:1-6; State v. Malik, 365 N.J.Super. 267, 279, 839 A.2d 67 (App.Div.2003), certif. denied, 180 N.J. 354, 851 A.2d 648 (2004).

*1228 V
We next address the Meintanas lawsuit and its effect on plaintiff's new trial motion. Meintanas, who worked for Mavety providing security, filed the suit on March 27, 2002, during the pendency of the palimony case, and about four months before the July 2002 trial. The suit named MMG Services, Inc., a Mavety-owned company, and Nicholson. Meintanas alleged that Nicholson and the attorney representing the estate in the palimony action urged him to avoid being subpoenaed by plaintiff to testify in the palimony trial or, if he was called as a witness, to perjure himself in a manner that would misstate the living arrangements and relationship between Mavety and plaintiff. When he refused to do so, he was fired.
That suit was later dismissed, apparently without any compensation to Meintanas. However, at the time of the palimony trial, the estate's attorney did not make plaintiff's counsel or the trial judge aware of the pending suit. Plaintiff's counsel learned of it after Judge Russell rendered her decision and entered final judgment and after the initial new trial motion was filed. Thus, plaintiff supplemented her new trial motion seeking as an additional ground for a new trial this newly discovered evidence.
Judge Russell analyzed the issue under Rule 4:49-1 and Rule 4:50-1. She concluded that a new trial motion under these circumstances should be granted when the newly discovered evidence "would probably alter the judgment." Quick Chek Food Stores v. Twp. of Springfield, 83 N.J. 438, 445, 416 A.2d 840 (1980); see also Aiello v. Myzie, 88 N.J.Super. 187, 196, 211 A.2d 380 (App.Div.), certif. denied, 45 N.J. 594, 214 A.2d 30 (1965). Conversely, evidence that is merely cumulative, impeaching or contradictory does not warrant setting aside a judgment or require a new trial. State v. Speare, 86 N.J.Super. 565, 581-82, 207 A.2d 552 (App.Div.), certif. denied, 45 N.J. 589, 214 A.2d 28 (1965).
The judge reasoned that the impact and materiality of the Meintanas litigation was not clear and "in the interest of justice, plaintiff should have had the opportunity to address any relevant issues involving the impact of the [Meintanas] litigation upon the [palimony] trial." Thus, although denying the new trial motion, she included provisions in her order that the aspect of the motion based upon newly discovered evidence was denied without prejudice and plaintiff was granted a limited post-trial discovery period "to determine whether the newly discovered evidence rises to the level of material evidence, impacting the decision in the [palimony] trial."
Rather than deposing Meintanas, Nicholson or any other witnesses or conducting any other discovery or investigation, plaintiff appealed. Plaintiff argues that no amount of discovery could ever determine the chilling effect that the firing of Meintanas had on other company employees. She further claims that had she been aware of the Meintanas lawsuit, she could have used it to impeach Nicholson and other witnesses called by the defense.
We reject plaintiff's broad claim on this issue. The trial judge gave plaintiff a fair and reasonable opportunity to develop information through discovery and investigation that might have tipped the scales in favor of a new trial. She failed to do so, and her conclusory contention that the existence of the pending litigation and its nature in and of themselves would probably alter the judgment and not merely constitute impeachment evidence that would not have that material effect, is speculation.

VI
Plaintiff's final argument, that the trial judge drew inferences that were not supported *1229 by case law or the Rules of Evidence, and any other arguments not specifically addressed in this opinion, lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).
Affirmed.