904 A.2d 769 (2006)
387 N.J. Super. 459
In re Matter of the ESTATE OF John C. SASSON, Deceased.
Superior Court of New Jersey, Appellate Division.
Argued January 18, 2006.
Decided August 16, 2006.
*770 Jack Dashosh, Randolph, argued the cause for appellant Emily J. Springer.
Meredith L. Grocott, Morristown, argued the cause for respondent Estate of John C. Sasson, (Schenk, Price, Smith & King, attorneys; Shirley B. Whitenack, of counsel; Ms. Grocott, on the brief).
Before Judges COLLESTER, LISA and S.L. REISNER.
The opinion of the court was delivered by
COLLESTER, J.A.D.
This is a palimony case which began as a probate action. John C. Sasson died intestate on October 12, 2004, at the age of fifty-seven. He was survived by two brothers, Steven and Richard. On October 20, 2004, Steven J. Sasson qualified as administrator of John's estate, later valued at about $1.1 million. Included was a townhouse titled in John's sole name at 21 Ridgewood Drive in Randolph, where he lived with Emily Springer. Pursuant to a verified complaint on behalf of the estate, an order to show cause issued to compel Emily to vacate the townhouse. She filed a counterclaim to direct the estate to convey the townhouse and John's 2002 BMW to her as well as a portion of his estate based upon a promise John made to her that he would support her for life. Judge Kenneth C. MacKenzie granted the estate's motion for summary judgment and dismissed the counterclaim. He directed Emily to vacate the townhouse within sixty days and to pay the carrying costs. Execution was stayed pending the outcome of this appeal.
*771 In her appeal Emily does not pursue an argument against Judge MacKenzie's ruling that the promises made by John of the townhouse and his BMW were unenforceable since there was no actual delivery or relinquishment of ownership by John to constitute valid inter vivos gifts. Farris v. Farris Engineering Corp., 7 N.J. 487, 500-01, 81 A.2d 731 (1951). Nor does she pursue a claim for the value of services she rendered during John's lifetime. Rather she argues that she is entitled to a portion of the estate's assets based on her claim that John promised that he would "take care of her" for the rest of her life.
There is considerable dispute as to what promises, if any, were made by John to Emily. However, since her appeal is from summary judgment, we are obliged to view the facts and inferences in a light most favorable to her. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); R. 4:46-2.
John and Emily met in January 2002, and began dating a month later. Both were unmarried. John was fifty-four and an engineer employed by the United States Army at Picatinny Arsenal with an annual salary of about $125,000. He was in the process of ending a twenty-one-year relationship with a woman, and was still living in her home until he was able to purchase a home for himself. Emily was thirty-eight and an attorney in private practice since 1999. When she met John, she was living in her solely-owned condominium in Monmouth Beach and working as an associate in a Red Bank law firm where she earned about $50,000 per year.
Although their relationship was only a few months old, John asked Emily to come live with him when he moved into his townhouse. She agreed and picked out most of the furniture and furnishings. While she still maintained her Monmouth Beach property, Emily moved to Randolph shortly after John's closing on June 22, 2002. Emily and John completely furnished the townhouse. They contracted various vendors and service people for repairs and improvements. Each shopped for food and supplies. Emily did the cleaning and housekeeping. She accompanied John to restaurants, sporting events, and the theater. She served as hostess at social and business gatherings at the townhouse and elsewhere.
Neighbors assumed that John and Emily were husband and wife, and John introduced Emily as his wife to various people in the community. They had theater subscriptions, resident tennis passes and service and repair contracts in the name of John and Emily Sasson. Mail arrived addressed to Emily under the name Emily Sasson, and Emily introduced herself as Emily Sasson to workmen who came to the house. She said that John often spoke of the townhouse as "our house," and sang to her the lyrics of a Crosby, Stills, Nash and Young song about "our house." John paid the mortgage and all the carrying costs of the home except the telephone. He kept cash in a drawer for Emily to use to pay household expenses.
As the months went on, Emily decided to give up her position as an associate in the Red Bank law firm. She said that John liked her to be home when he was home. He encouraged her to open her own practice and work mainly out of the townhouse. Emily said that John knew she would not make as much money but assured her that he would support her financially and emotionally in starting her own law practice. Emily left the law firm in May 2003. Her earnings decreased to about $10,000 over the next year. Her law office was called Law Center of Ocean & Monmouth, specializing in family law. She maintained a "virtual office" to meet clients in Sea Girt but did most of the *772 work from an office in the Randolph townhouse with a computer, fax, printer and copier.
Emily certified that John promised to take care of and provide for her for the rest of her life in the townhouse. On December 7, 2003, he named Emily the beneficiary of his Sequoia IRA valued at approximately $150,000. He told her he would transfer to her the title to his 2002 BMW M3 when her auto lease expired in November 2004. John proposed to her on September 14, 2004, and gave her a diamond ring that belonged to his grandmother. They each told relatives and friends of the engagement. They planned to be married in a religious ceremony after an appropriate mourning period had elapsed for John's mother who had died in August.
Emily said that after her uncle died in September 2003, John asked her to draw up a will for him naming her as sole beneficiary of everything he owned. She told him she could not because of a conflict of interest and said he should meet with another attorney or draft one himself using the will forms that were on their shared computer. After John's mother died, he suggested to Emily that she prepare reciprocal living wills with powers of attorney.
On October 9, 2004, John was critically injured after an accidental blow to his head during a basketball game. He died three days later at age fifty-seven. He died without a will and without making a beneficiary designation on his employee life insurance policy. His estate was valued at about $1.1 million.
The funeral notice in the local newspaper listed Emily as John's fiancée. John's brothers arrived for the funeral, Steven from New York state and Richard from Texas. At first, they stayed at the townhouse, but they had a falling out with Emily. When Steven and Richard returned to the townhouse to do an inventory for the estate, Emily called the Randolph police and said she lived in the townhouse and was going to settle the estate. The following day she called the police again when Steven, Richard and John's former paramour, went to the townhouse to obtain records. The responding officer advised the parties to contact their attorneys. The complaint by the estate to evict Emily from the townhouse was filed a short time later.
In granting summary judgment on Emily's counterclaim, Judge MacKenzie distinguished case law in this State enforcing a promise of support where the parties lived together functioning as a family unit for a considerably longer period of time and where the claimant suffered harm because of reliance on a broken or unfulfilled promise. See Kozlowski v. Kozlowski, 80 N.J. 378, 403 A.2d 902 (1979); Crowe v. De Gioia I, 90 N.J. 126, 447 A.2d 173 (1982), aff'd, 102 N.J. 50, 505 A.2d 591 (1986); In re Estate of Roccamonte III, 174 N.J. 381, 808 A.2d 838 (2002).
In his written opinion Judge MacKenzie stated:
Springer and Sasson's relationship was not of the decades-long duration as in the cases cited, nor did they raise children together. Springer retained most of her separate identity, unlike those women, and did not give up her real property in Monmouth, but rented it. She did not give up all employment, but rather was self-employed as a sole practitioner and could likely return to a more profitable firm job at her option. Her two-year relationship with Sasson did not hinder her ability to maintain herself comfortably. By contrast, the plaintiff in Roccamonte was "living in poverty, dependent entirely on social security payments of under $1,000 a month and food stamps." In re Estate of Roccamonte (III), 174 N.J. 381, 389, 808 A.2d *773 838 (2002). That plaintiff also received $18,000 from insurance, $10,000 from a certificate of deposit and title to the couple's apartment, which had a monthly maintenance cost of $950. Clearly the amount she received was insufficient to support her for life. Sasson left Springer an IRA worth nearly $150,000, and she has assets of her own.
Springer did not leave Sasson and require this promise to return, nor did she perform services requiring compensation in this manner. See Kozlowski v. Kozlowski, 164 N.J.Super. at 168-69, 395 A.2d 913 (holding that the woman had an employment relationship with her boyfriend because he said "he would take care of her and provide for her if she would only come back and resume her functions in the household as she had performed them in the past"). Springer has never claimed that John Sasson conditioned her living in the townhouse on her performance of any duties. Apparently, she did housework at the townhouse, but was still able to maintain her legal practice. It is not uncommon in close dating relationships for one party to perform chores in the other's home, and Springer does not claim to have provided business or legal services, which would be less typical. To the extent that these services required recompense beyond Springer not paying rent on the townhouse, Sasson's naming of her as IRA beneficiary has compensated her $148,000, the extent he apparently intended. There is no evidence more was intended by him or can be reasonably expected by her.
In her deposition, she stated that Sasson indicated his intention to change title to the property after their marriage. They had not married at his death, so she is not entitled to the property because the condition precedent was not satisfied. The fact that they may have held themselves out as husband and wife socially is irrelevant as New Jersey does not recognize common law marriage. N.J.S.A. 37:1-10. Further, Springer never contributed to the purchase or maintenance of the home beyond domestic chores and paying the telephone bill. As noted above, the IRA has compensated her amply for her services.
For over twenty-five years it has been the law of this State that unmarried adult partners, even those married to others, may cohabit in a marital-type relationship and that if one of the partners is induced to enter or remain in that relationship by a promise of support for life, the promise will be enforced. Kozlowski, supra, 80 N.J. at 386-87, 403 A.2d 902. Whether there was either an express or implied contract requires analysis of both the words and the actions of the parties to determine whether the promise was made and some form of consideration given by the one seeking to enforce the promise. See Roccamonte III, supra, 174 N.J. at 389-90, 808 A.2d 838. Consideration for the promise to support need not be of equal benefit; it is sufficient as long as it is the bargained for detriment. Crowe v. De Gioia II, 203 N.J.Super. 22, 31, 495 A.2d 889 (App.Div.1985), aff'd, 102 N.J. 50, 505 A.2d 591 (1986). If the promise was made and consideration received, it is an enforceable contract against the promisor's estate.
[I]t is not the promisor's death that triggers her entitlement but rather his failure, during his lifetime, to have made adequate provision for the promisee, an obligation whose fulfillment does not depend solely or exclusively on testamentary disposition. As such, the promise is neither a gratuitous promise nor a contract to make a will and is not subject to defeat on that basis. It is simply a contractual undertaking binding the *774 estate like any other contractual commitment the decedent may have made in his lifetime.
[Roccamonte III, supra, 174 N.J. at 397, 808 A.2d 838.]
If such an enforceable promise of support for the promisee's lifetime was made and broken, the promisee will be awarded damages in a lump sum award "predicated on the present value of the reasonable future support defendant promised to provide, to be computed by reference to [the promisee's] life expectancy. . . ." Kozlowski, supra, 80 N.J. at 388, 403 A.2d 902.]
As we recently summarized in Levine v. Konvitz, 383 N.J.Super. 1, 3, 890 A.2d 354 (App.Div.), certif. denied, 186 N.J. 607, 897 A.2d 1061 (2006),
In order to establish a prima facie case for palimony, a plaintiff must present competent evidence showing: (1) that the parties cohabitated; (2) in a marriage-type relationship; (3) that, during this period of cohabitation, defendant promised plaintiff that he/she would support him/her for life; and (4) that this promise was made in exchange for valid consideration.
In discussing these elements, we raised but specifically did not address the question of how long a period of cohabitation is required. We stated only that
It is sufficient to say, that a court confronted with this issue, should look to the length of the cohabitation as an indicator of the parties' commitment to the relationship, as that may bear on the question of valid consideration.
[Ibid.]
Nonetheless, a crucial element of a palimony claim is cohabitation for a "significant period of time." McDonald v. Estate of George Mavety, 383 N.J.Super. 347, 360, 891 A.2d 1218 (App.Div.), certif. denied, 187 N.J. 79, 899 A.2d 302 (2006). In Kozlowski, supra, 80 N.J. at 378, 403 A.2d 902, although married to others, the parties lived together for fifteen years. In Crowe, supra, 203 N.J.Super. at 27, 495 A.2d 889, the relationship akin to marriage was for twenty years. In Roccamonte III, supra, 174 N.J. at 385, 808 A.2d 838, it was twenty-five years. By way of contrast, in Zaragoza v. Capriola, 201 N.J.Super. 55, 59, 492 A.2d 698 (Ch.Div.1985), while the parties' relationship continued over six years including conception and the birth of a child, they lived together for only about eleven months before separating. The Chancery judge found no basis for a palimony claim based on the short period of cohabitation.
Here Emily and John lived together for only two and one-half years. Their relationship ended not because of a broken promise but by John's sudden and unanticipated death. Emily argues that the relatively short length of their cohabitation should not be a determinative factor when it was clearly demonstrated they intended to share their lives together including marriage. But life is composed of sudden changes of mind or heart as well as changed circumstances including unexpected tragedies. Accordingly, the period of cohabitation was an appropriate factor considered by the motion judge.
Of greater significance is the issue of detrimental reliance on the promise. In Kozlowski and Roccamonte the plaintiffs left the relationship and were induced to return by a promise of future support. Here Emily was not induced to live with John by a promise of support but chose to do so based on her feelings for him. Moreover, unlike other cases where a palimony award was upheld, Emily was not left destitute nor did she suffer severe economic dislocation by a failure to enforce *775 the promise to "take care of her" for the rest of her life.
In Kozlowski the plaintiff, a sixty-three-year-old unsophisticated woman with little knowledge of the English language was cast adrift by the defendant, a successful businessman, after fifteen years of cohabitation, leaving her with no assets, job skills or means of support. In Crowe the plaintiff and her seven children cohabited with defendant in his home for twenty years before plaintiff left, and she had no means of support absent an enforcement of defendant's promise. The facts of Roccamonte were even more extreme. Plaintiff was seventy-seven, lived with her disabled daughter and was entirely dependent on social security and food stamps as a result of the failure of defendant to abide by a promise of support.
Emily was hardly left destitute. Aside from the $150,000 IRA John assigned to her, she still owns her condominium in Monmouth Beach and is a practicing lawyer, which enables her to support herself. While Emily stresses that she gave up her associate position in a law firm while living with John, she did not give up that position as a condition of entering into or continuing the relationship, but only to spend more time with John. Moreover, the loss of income in the fourteen months from Emily leaving her position and starting up her own practice is ameliorated by the fact that John paid almost all of Emily's expenses during their cohabitation and made a gift to her of his IRA. There was no significant detrimental reliance by Emily on John's promise of lifelong support. Although she suffered a severe loss when John died, that loss cannot be remedied by an award of palimony.
Affirmed.