890 A.2d 354 (2006)
383 N.J. Super. 1
Jeanette LEVINE, Plaintiff-Appellant,
v.
Philip KONVITZ, Norman Konvitz, and Howard Walter, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 2005.
Decided February 6, 2006.
*355 Patrick T. Collins, Bridgewater, argued the cause for appellant (Franzblau Dratch, attorneys; Mr. Collins, on the brief).
Gerard G. Brew, Newark, argued the cause for respondents (McCarter & English, attorneys; Mr. Brew, of counsel and on the brief; Alison Coriaty O'Sullivan, on the brief).
Before Judges WEFING, WECKER and FUENTES.
The opinion of the court was delivered by
FUENTES, J.A.D.
This appeal requires us to address whether cohabitation is an indispensable element of a cause of action seeking palimony support. The question arises in the context of the parties' extramarital romantic relationship, which spanned over seventy years. It is undisputed that they never cohabited during the entire period of their relationship.
As defendant was reaching the end of his life, plaintiff initiated this palimony suit, seeking to enforce an alleged promise that he would support her for the rest of her life. Defendant allegedly made this promise in consideration for the emotional and social support plaintiff had shown him, and the love and commitment she displayed throughout their long-term relationship. The trial court dismissed plaintiff's case, finding that any promise of support made by defendant was unenforceable, because the parties had never cohabitated in a marital-type relationship.
We now affirm the trial court's judgment and, in so doing, reaffirm what, in our view, has been implicitly and consistently held by the Supreme Court in In re Estate of Roccamonte, 174 N.J. 381, 808 A.2d 838 (2002); Crowe v. De Gioia, 90 N.J. 126, 447 A.2d 173 (1982); and Kozlowski v. Kozlowski, 80 N.J. 378, 403 A.2d 902 (1979), the three cases that have considered and analyzed the cognizability of palimony-support enforcement actions. In order to establish a prima facie case for palimony, a plaintiff must present competent evidence showing: (1) that the parties cohabitated; (2) in a marriage-type relationship; (3) that, during this period of cohabitation, defendant promised plaintiff that he/she would support him/her for life; and (4) that this promise was made in exchange for valid consideration.
We need not and, specifically do not address here, the question of how long a period of cohabitation is required in order to satisfy this element of the cause of action. It is sufficient to say, that a court confronted with this issue, should look to the length of the cohabitation as an indicator of the parties' commitment to the relationship, as that may bear on the question of valid consideration. In other words, a lengthy period of cohabitation provides a more reliable indication that the relationship involved:
[A] way of life in which two people commit to each other, foregoing other liaisons and opportunities, doing for each other whatever each is capable of doing, providing companionship, and fulfilling each other's needs, financial, emotional, *356 physical, and social, as best as they are able.
[In re Estate of Roccamonte, supra, 174 N.J. at 392, 808 A.2d 838.]

I

Facts Contended by Plaintiff
For purposes of our discussion, we will adopt, in its entirety, plaintiff's version of the nature and characteristics of the parties' relationship. Plaintiff, Jeanette Levine, is now eighty-five years old. Defendant Philip Konvitz, who was approximately ninety-one years old at the time plaintiff filed this cause of action in 2004, is now deceased.
The parties both grew up in Newark. They began dating when plaintiff was in her mid-teens. Although, according to plaintiff, defendant wanted her to marry him, she considered herself too young to make such a commitment at the time. Defendant married another woman when he was in his early twenties. His romantic relationship with the plaintiff, however, continued, and they "saw each other" on a regular basis.
At the time, their relationship consisted of defendant visiting plaintiff at her place of work or when she was on vacation. According to plaintiff, she did not have a sexual relationship with defendant until she was thirty-five years old. Defendant was married at the time this sexual relationship began.
Defendant continued to reside with his wife until her death in 1999. Plaintiff did not marry until she was forty years old, at which time the parties temporarily suspended their sexual relationship, but continued as friends and acquaintances. According to plaintiff, her husband was frequently away from home on business. During these periods, the parties resumed their physical relationship. Plaintiff's husband died in 1976. From that point forward, the parties' romantic relationship continued until 2003.
After plaintiff's husband's death, her lifestyle was maintained by financial support provided by defendant. In her certification submitted to the trial court, plaintiff describes defendant as "a wealthy and successful businessman, [who] began supporting me and buying me more lavish gifts than he had in the past." From 1996 to 1999, plaintiff was "placed" on the payroll of one of defendant's companies at an annual salary of $48,000. Plaintiff alleged in her complaint that as a result of a government investigation in 1998, defendant began paying her directly $6,000 per month and $2,000 per month to her daughter.
In addition to this income, defendant gave the plaintiff cash, "as well as periodic gifts, sometimes by way of checks and at other times through jewelry, furs and otherwise." Defendant also took financial responsibility for any maintenance required to plaintiff's home or automobile.
In 1983, defendant purchased a condominium in Long Branch, which was close to his marital residence. In her certification, plaintiff averred that this was intended to "facilitate us spending a greater amount of time together than we were while I resided in my home in South Orange." By deed dated May 22, 1985, defendant transferred the condominium property to plaintiff. Although the deed reflected a purchase price of $80,000, plaintiff certified that "I paid nothing for it."
Despite this arrangement, plaintiff never moved into this residence because she "became uncomfortable with the notion of living in such close proximity to where [defendant] resided with his wife." Plaintiff sold the condominium property in April *357 1986 for $131,000. She kept all the proceeds of the sale.
The parties never lived together. After her husband's death, defendant stayed overnight at plaintiff's home "periodically." After defendant's wife's death in 1999, defendant invited plaintiff to live with him in Long Branch. According to plaintiff,
I gave considerable thought to doing this, but because of the animosity felt toward me by Phil's three children, I declined to. Instead, I began to spend weekends at a hotel near Phil's home, which we would spend together, and commencing in or around 2002, I began to stay at Phil's home on weekends. I would arrive on Thursday or Friday, and stay until Sunday or Monday, sometimes until Tuesday. Phil wanted me with him, and wanted no one else around us when we were together in his home.
Plaintiff characterized her relationship with defendant as an open one, known to friends and neighbors. In fact, according to plaintiff, defendant repeatedly told her that his wife was aware of it. Their social activities included going out to dinner "every Sunday" and attending the theatre in New York City.
In June 2003, in part due to his advanced age and declining health, defendant issued powers of attorney to his son Norman Konvitz and a friend named Howard Walter, named co-defendants in this case. This appears to have been the turning point in the relationship.
Also at this time, defendant's payments to plaintiff in the amount of $6,000 per month and an additional $2,000 per month for her daughter, not the child of the defendant, ceased. In November 2003, defendant's son prohibited plaintiff from visiting defendant at his home in Long Branch. Telephone contacts and other forms of communication became less frequent and eventually ceased.
In the last paragraph of her certification to the trial court, plaintiff summarized her relationship with defendant and the basis of her claim for support as follows:
It may be true that we did not ever share a home, largely due to the fact that one or both of us has been married during the majority of our relationship. I could have resided with [defendant] had I agreed to after his wife died, but I felt that if I did, he would experience much grief at the hands of his children, whose resentment toward me I readily understand. [Defendant] has loved me for nearly all of his long life, and supported me for almost thirty years; his doing so when we each had our own homes speaks to the strength of our love, as he could have removed himself from the relationship far more easily than if we had lived together. It is only "special" relationships that can support a claim for the enforcement of an agreement such as we had, I can assure the Court that few are more special than ours.

II

Legal Analysis
Kozlowski was the first New Jersey case that directly addressed the enforceability of palimony support actions. The Supreme Court framed the issue before it as follows:
The primary issue on appeal is whether a man and a woman who are not married to each other, and who live together without a promise of marriage, may enter into a contract which, if otherwise valid, is enforceable by our courts.
[Kozlowski, supra, 80 N.J. at 380, 403 A.2d 902 (emphasis added).]
The Court described the plaintiff in Kozlowski as an unsophisticated Polish immigrant, *358 who had an amorous relationship with a "well-to-do business man." Id. at 381, 403 A.2d 902. Plaintiff was forty-eight years old and married with two children. Defendant was six years her junior, also married and with two children of his own. Defendant was the initial pursuer. He "insisted that they leave their [respective] families and set up a new household together." Ibid. From this point, the Court gave the following description of the parties' relationship:
After about four months of vacillating and agonizing, [plaintiff] capitulated. Together the loving couple moved into an apartment and later a house, in which they lived in what may be fairly characterized as the illicit equivalent of marital bliss. Three of the four children of their prior marriages joined them during the early years of their new relationship and grew up in an atmosphere not dissimilar to that of a normal family unit. The last child reached adulthood and left the household in about 1970, after which defendant sold the original house and purchased a smaller one for himself and plaintiff alone. The parties lived together for a total of 15 years, continuously except for two brief separations.
[Ibid.]
On the question of consideration, the Kozlowski court emphasized plaintiff's devotion to defendant, and the many services she performed for him during their long-term period of cohabitation. The court also found evidential support for the trial court's conclusion that defendant had made an explicit promise to plaintiff "to take care of her the rest of her life." Id. at 385, 403 A.2d 902.
The central concern of the Court in Kozlowski was the public policy implications of enforcing such a promise in a context outside of marriage. That is, was plaintiff's enforcement claims barred, as a matter of public policy, under the doctrine of the unlawfulness of so-called meretricious relationships? In rejecting such a prospect, the Court adopted the following explanation provided by the California Supreme Court in Marvin v. Marvin:
The mores of the society have indeed changed so radically in regard to cohabitation that we cannot impose a standard based on alleged moral considerations that have apparently been so widely abandoned by so many. Lest we be misunderstood, however, we take this occasion to point out that the structure of society itself largely depends upon the institution of marriage, and nothing we have said in this opinion should be taken to derogate from that institution. The joining of the man and woman in marriage is at once the most socially productive and individually fulfilling relationship that one can enjoy in the course of a lifetime.
We conclude that the judicial barriers that may stand in the way of a policy based upon the fulfillment of the reasonable expectations of the parties to a nonmarital relationship should be removed. As we have explained, the courts now hold that express agreements will be enforced unless they rest on an unlawful meretricious consideration.
[Id. at 386, 403 A.2d 902 (quoting Marvin v. Marvin, 18 Cal.3d 660, 134 Cal. Rptr. 815, 831, 557 P.2d 106 (1976)).]
Against this backdrop, and as a final point of emphasis, our Supreme Court in Kozlowski recognized that a promise of support made in the context of "unmarried cohabitation" cannot be termed meretricious and unenforceable, merely because the parties engaged in sexual relations. Id. at 387, 403 A.2d 902. Any reasonable reading of Kozlowski can yield at least one undeniable conclusion: the court was grappling *359 with the legal implications of social forces that had de-stigmatized cohabitation by men and women outside of marriage. Promises of support made in the context of these marital-type relationships were deemed enforceable and, as a consequence, non-meretricious, because the consideration sustaining the contract was based on aspects of the relationship other than sexual relations.
Thus, for the first time, the full spectrum and complexity of human relationships in a marital-type setting was being carefully examined and validated, based on the qualitative value of the contribution made by the individual partner. On the question of enforceability, sex was simply irrelevant to the discussion. It was, undeniably, a legal acknowledgment that traditional so-called "homemaker" or "work-in-the-home" activities were legally sufficient consideration to sustain a contract.
Three years after Kozlowski, in Crowe, supra, 90 N.J. at 129, 447 A.2d 173, the Court considered the question of "whether temporary relief can be awarded in a suit to enforce an agreement between unmarried cohabitants." As in Kozlowski, the facts in Crowe informed the Court's analysis of the issue:
In a verified complaint filed in the Chancery Division, plaintiff, Rose K. Crowe (who states she is also known as Rose K. De Gioia), claimed that defendant, Sergio De Gioia, breached his non-marital agreement to support her for life. Her complaint alleged the following facts pertaining to their twenty-year relationship. She met De Gioia in February 1960 when she was 38 and separated from her husband, whom she has since divorced. She was the mother of seven children ranging in age from five to seventeen years. He was 26 and single. Starting in 1960, she and her children lived with and were supported by him. From 1967 to 1980, when De Gioia left, they lived in his house in Perth Amboy. Most significantly, he declared that "he would take care of her and support her for the rest of her life, and that he would share with her his various assets."
In return for his support, she acted like his wife: cooking, cleaning, caring for him when he was ill, helping in his various business ventures, and accompanying him socially. Their relationship was akin to a marriage. Even at the end of their relationship, when De Gioia told her he was leaving to marry a woman 22 years his junior, he promised to give her a "good settlement" so that she would not have to be concerned with her own support. That settlement, however, did not materialize. Crowe asked the court to enforce her alleged agreement with De Gioia for support, to compensate her for her services, and to award her a share of his assets, costs and counsel fees.
[Id. at 129-130, 447 A.2d 173 (emphasis added).]
Crowe is widely cited and accepted as the leading case for determining the standards that a court must apply in the context of a petition for temporary relief. In granting plaintiff's application for such relief, the Court in Crowe emphasized the need to preserve the status quo, which principally involved plaintiff's claims that she had resided in defendant's residence with her children, and performed all of the functions and activities associated with a marriage, including an extended period of cohabitation. As the Court noted, "[t]he interest of an unmarried cohabitant in enforcement of a support agreement and the trauma of eviction from one's home may well justify the intervention of equity." Id. at 133, 447 A.2d 173. Once again, the Court deemed cohabitation to be an indispensable *360 predicate element for the relief sought.
The latest issue in this ongoing debate arose in Roccamonte, supra, 174 N.J. at 385, 808 A.2d 838. As in Kozlowski and Crowe, the facts in Roccamonte involved a claim of support made by plaintiff, a long-term cohabitant of defendant. In fact, the parties resided in the same household for over twenty-five years. Ibid. Plaintiff filed her claim against the estate of her long-time partner, seven months after his death. Id. at 387, 808 A.2d 838.
In deciding in plaintiff's favor, Judge Pressler eloquently expressed the nature of the relationship involved:
Despite the high degree of congruency in the facts of Kozlowski, Crowe, and this case, the Estate argues that even if a promise were made, it would fail for want of consideration. The Estate takes the position that because sexual favor as the sole consideration would render the palimony contract unenforceable as meretricious, the consideration, as in Kozlowski and Crowe must include domestic services, and plaintiff, it argues, was not required by Roccamonte to perform such services. That argument, however, misperceives the fundamental point of our palimony cases. The principle we recognized and accepted is that the formation of a marital-type relationship between unmarried persons may, legitimately and enforceably, rest upon a promise by one to support the other. A marital-type relationship is no more exclusively dependent upon one partner's providing maid service than it is upon sexual accommodation. It is, rather, the undertaking of a way of life in which two people commit to each other, foregoing other liaisons and opportunities, doing for each other whatever each is capable of doing, providing companionship, and fulfilling each other's needs, financial, emotional, physical, and social, as best as they are able. And each couple defines its way of life and each partner's expected contribution to it in its own way. Whatever other consideration may be involved, the entry into such a relationship and then conducting oneself in accordance with its unique character is consideration in full measure. There is no doubt that plaintiff provided that consideration here until her obligation was discharged by Roccamonte's death.
[Id. at 392-93, 808 A.2d 838.]
We are required here, to examine one aspect of the so-called "marital-type" relationship, "cohabitation," as a step in the analysis of determining the enforceability of a promise of support. We are confident that reasonable minds can and do in fact differ on the definition of a "marital-type" relationship. We are equally confident that cohabitation was an implied and indispensable part of Judge Pressler's poetic description of the term.
Although the quality, nature, and extent of the consideration sufficient to sustain a palimony action may differ depending on all the circumstances, we are satisfied that the rendering of such consideration must be done in a setting of cohabitation. Without such a bright-line requirement, the concept of "marital-type" relationship is unacceptably vulnerable to duplicitous manipulation.
Requiring cohabitation as an element of a palimony action also provides a measure of advance notice and warning, to both parties to a relationship, and to their respective family members, that legal and financial consequences may result from that relationship. In this context, cohabitation requires the demonstrable act of setting up a household together. Thus, in contrast to an extramarital affair, even a long-term one, cohabitation announces to *361 the ones most affected by the existence of the relationship, the innocent spouse and dependent children, that defendant has entered into a relationship that may result in significant and long-term impairment of family assets.
Finally, cohabitation is the physical manifestation of what Judge Pressler described in Roccamonte as "the undertaking of a way of life in which two people commit to each other, foregoing other liaisons and opportunities." Id. at 392, 808 A.2d 838. Here, the parties disregarded this fundamental aspect of a marital-type relationship. Throughout their long-term affair, each party married other people; had children with their respective spouses; and otherwise carried on full lives, independent of the other.
The theme consistently running through the trilogy of cases that have examined palimony actions, has been to provide equitable relief to a plaintiff, who had devoted a significant part of her life to caring and providing for defendant, and as a result, forsaking all other opportunities for independent living. A finding of cohabitation is an indispensable element of the cause of action, because it provides concrete proof that the plaintiff's devotion was significantly induced by a promise of support. Without evidence of cohabitation, a palimony action cannot be sustained as a matter of law.
Affirmed.