938 A.2d 143 (2008)
397 N.J. Super. 477
Rosemary CONNELL, Plaintiff-Respondent/Cross-Appellant,
v.
Edward DIEHL, Defendant-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted October 15, 2007.
Decided January 8, 2008.
*145 Cutler, Simeone, Townsend, Tomaio & Newmark, Morristown, attorneys for appellant/cross-respondent (Joel C. Seltzer and Dominic A. Tomaio, of counsel; Messrs. Seltzer and Tomaio and Shari Veisblatt, on the briefs).
Fiedler & Schepis, attorneys for respondent/ cross-appellant (Laurie W. Fiedler, Wayne, of counsel and on the brief).
Before Judges STERN, A.A. RODRÍGUEZ and C.L. MINIMAN.
The opinion of the court was delivered by C.L. MINIMAN, J.A.D.
In this quintessential palimony action, defendant Edward Diehl appeals from a December 6, 2005, judgment in favor of plaintiff Rosemary Connell awarding $107,494.40 in palimony, $70,000 as a return of an inheritance Connell received in 1997 and gave to Diehl and $15,000 in counsel fees, less a partial payment of $36,000 from Diehl to Connell after they separated. Connell cross-appeals from the quantum of the award. We affirm the judge's conclusion that Connell is entitled to palimony, but reverse the quantum of the award and remand for reconsideration of the award by the trial judge.

I.
Connell is currently sixty-one years old and suffers from Stargardt's disease, a juvenile form of macular degeneration, which she has had since she was thirteen years old. She is legally blind, having only peripheral vision. Connell is a high school graduate and collects Social Security disability benefits, which began in 1973. When she was in her early twenties, Connell married Brian Connell and on June 8, 1970, a son, Brian Connell, Jr., was born. That year Connell and her husband divorced and she received permanent alimony of $20 every other week as well as weekly child support.
In 1972 Diehl met Connell through a dating service and they dated for two and one-half years. In 1974 they began to discuss cohabitation. Connell's parents did not want her and Diehl to live together unmarried, so she told Diehl that it would be humiliating to cohabitate without getting married. Diehl told Connell, "It isn't necessary to have a piece of paper when two people want to be together. You can have the same commitment. Honey, you know me, I would never abandon you. *146 You don't need anything like that." Connell testified that she thought it would be okay. Diehl then told Connell that they would tell everyone that they were married, she would have a ring, nobody would know they were not married and it was no one's business anyway. Diehl gave Connell a fourteen-karat gold ring with three garnets, which was inscribed, "Always." Diehl, Connell and Brian, Jr., then began living together in an apartment in Maywood.
Once Connell and Diehl began cohabitating and telling everyone that they were married, Connell's former husband ceased making alimony payments. Connell never disputed the termination of alimony. Diehl introduced Connell to everyone as his wife and Brian as his son. Connell began to use Diehl's last name, which at that time was Pojedneck. When Diehl changed his last name, Connell began using "Mrs. Diehl." Connell's parents were the only people, except for medical providers, who came to know that the two were not legally married. Connell's cousin, Marilyn Pieretti, even sent Connell and Diehl a 25th wedding anniversary card addressed to "Mr. and Mrs. Diehl."
After they began to live together, Diehl started investing in residential real estate. Over the years Diehl acquired a number of apartment buildings, which by the time of this action contained a total of twenty-six units. Diehl's tenants all paid their rent in cash with the lowest rent being $473 and the highest being $800 per month. Diehl deposited this rental income into the joint checking account with Connell to pay their bills. Connell learned Spanish to help communicate with current and prospective tenants. She screened prospective tenants calling about vacant units and generally maintained Diehl's business calendar. Connell answered late-night calls from tenants, cleaned apartments after they were vacated and waited in empty apartments for handymen and utility workers to arrive. Diehl told Connell that the residential real estate investments were for their future retirement.
In the early 1980s Diehl purchased a stuffed-potato concession stand in East Brunswick. Connell also worked at the stand, helping where she could by scrubbing potatoes, cleaning the steam table, taking out the garbage and cleaning the soda machine. Thus, Connell assisted Diehl in all of his business ventures.
Connell used the child support payments she received and her Social Security disability benefits to purchase food for the family. When the Social Security Administration discontinued issuing checks, Connell opened a bank account for direct deposit of her disability benefits. Connell and Diehl also maintained joint banking accounts at PNC Bank. During the entire time they lived together, Diehl was the primary financial support for Connell and Brian. Connell did not work outside the home but contributed to the family by working in Diehl's business endeavors and performing household duties, such as cleaning, cooking and laundry. During their thirty-year relationship, Diehl provided for Connell in his estate plans. Ultimately, he executed a last will and testament in 1990 that made her the sole beneficiary of his estate.
In 1978 Connell and Diehl began searching for a single-family home. They looked at potential homes together. While Connell liked all the homes that they saw, Diehl ultimately choose the home that he liked best, which was located in Lincoln Park. Diehl referred to the home as "our home," but title was in his name alone. Connell never thought about the fact that her name was not on the title of their Lincoln Park home because, "I didn't have any insecurity at all being with [Diehl]. I *147 just  I just totally believed that he was taking care of me and always would."
After moving into the Lincoln Park home, Diehl continued to fully support the family. Connell continued to use child support and Social Security disability benefits for the family's food. Connell continued to contribute by performing household chores such as cooking, cleaning and laundry. Connell also decorated the family's home. Although they made joint decisions on carpeting and furniture choices, Connell picked out curtains, pictures, mirrors, plants and other decorations by herself.
At some point Diehl made an arrangement with Connell's former husband that permitted Diehl to claim Brian as a dependent on Diehl's income tax returns every other year. In 1987 after Connell's former husband died and the child support money ceased, Diehl claimed Brian on his tax returns annually until Brian was eighteen. Connell was never required to file income tax returns due to her low level of income. Because of her limited eyesight, she has never had a driver's license. Therefore, Diehl was her primary source of transportation.
Diehl and Brian had a very good relationship. Brian admired Diehl and considered him to be his father. Brian never showed Diehl any lack of respect and there was never any fighting or arguing between them. Diehl attended Brian's school events and drove him to places he needed to go. Diehl also attended Brian's high school graduation. Connell, Diehl and Brian ate their dinner meals together every night. Over the years, Connell, Diehl and Brian took family vacations together, and Connell and Diehl would also take vacations with each other, some outside the United States. Diehl paid for all of the vacations. They spent holidays together, and were always together for other family events such as weddings, christenings, birthday parties, anniversary parties and other family parties. Connell and Diehl gave joint gifts, signing the cards, "Mr. and Mrs. Pojedneck" or "Mr. and Mrs. Diehl," just as the invitations had been addressed.
When Connell's mother died in 1997, her father having died years earlier, Connell received an inheritance of $70,000, which she gave to Diehl to pay for various household items and some major home remodeling. Diehl placed the money in a joint Scudder account, but then moved it to an account in his name only. Diehl used the money for office equipment consisting of a computer, scanner, printer, desk and chair; a complete remodeling of the kitchen including all new appliances; new landscaping; and new household furniture for the living room, dining room and breakfast nook. The remainder of the inheritance money went into an investment account in Diehl's name alone.
Connell and Diehl frequently discussed their future and potential locations for their retirement, such as South America. Connell completely trusted that her relationship with Diehl was permanent. Diehl had promised to take care of Connell for her entire life, as he would a wife. Diehl told Connell that he loved her, that they would remain together as they got older and that she knew what kind of a man he was. Connell was very happy with Diehl and felt very fortunate to have him, because he provided for her and took care of her and her son. Connell always believed that the relationship was permanent and that Diehl would always take care of her no matter what. Connell testified, "It never occurred to me that we ever could break up. I knew I certainly would never leave him. It never occurred to me."
In 2002, Diehl started a new business, The Big Finger, a novelty-item business, which Diehl thought he could market on *148 the internet through sources such as eBay. Diehl used Connell's credit to finance this business venture, borrowing $30,000 in Connell's name. This would ultimately lead Connell to bankruptcy.
Beginning in 2002 Connell and Diehl's relationship began to deteriorate. Prior to that time Diehl was generally satisfied with Connell's homemaking abilities. However, Diehl began accusing her of losing papers and magazines when she would tidy up the home. Connell testified that Diehl left things all over the home and she would keep things tidy in little piles for him. However, Diehl would wake her up at 3:00 or 4:00 in the morning, accusing her of losing things and making her search for them, sometimes even through their garbage cans outside. Diehl began to ignore Connell and, when he did speak to her, he would have outbursts where he cursed at her and was verbally abusive. He had never done this before.
In the Spring of 2002 Connell and Diehl started eating dinners at various local restaurants on Sunday afternoons for a few months, because she believed it was the only way for the two of them to spend time together. Diehl had begun to avoid her and not spend much time with her. Connell used the joint checking account to pay for the dinners by writing checks payable to herself and cashing them. However, Connell hid these expenses by writing in the check register that the check was for a Sears Roebuck or Macy's bill. They spent approximately $200 per month on restaurant dinners. Diehl was extremely angry when he learned that Connell was using the joint checking account for their dinners and stated that, if he had known about the source of the money, he would not have agreed to go out to eat with her. As a result of the incorrect entries, Diehl did not deposit enough money into the joint checking account to cover the amount of checks and the overdraft line of credit linked to the account was used to cover the overdrawn amounts.
Just before Connell's fifty-ninth birthday during the Winter of 2002, Diehl told her that he no longer wanted her to live with him and suggested that he take her to Florida to live because the cost of living there was lower than in New Jersey. Connell refused because she did not know anyone in Florida. Sometime later Diehl brought Connell to the PNC bank where they had a joint bank account to have Connell sign a form removing herself from their joint account. The bank employee instructed Connell where to sign and asked her if she knew that she was removing herself from the account and giving up her right to the balance in it. Connell admitted that she knew what she was doing but assumed that there would be a new joint account. Diehl did not create such an account.
When the novelty items sold by The Big Finger were not enough to pay back the loans, Diehl told Connell at the end of 2002 to file for bankruptcy rather than use his own money to pay back the loans taken in her name. He found a bankruptcy attorney for her, took her to the attorney's office and told her how to answer the questions for the bankruptcy paperwork. Connell did not indicate that she had any claim against Diehl in the bankruptcy petition. She filed the petition in 2003 and was discharged in bankruptcy on December 26, 2003.
In January 2004 Diehl told Connell that she had to move out of their home. Connell begged Diehl to change his mind but he would not do so. On March 4, 2004, Connell secured counsel and paid a $5000 retainer. Connell had difficulty finding an apartment due to her inadequate monthly income and her recent bankruptcy. Although Diehl suggested she get Section *149 Eight housing and other governmental services, she instead found a trailer in Tom's River where her uncle lived. Diehl secured the trailer for her with a $26,000 down payment. Connell wanted to purchase the trailer solely in her name but was unable to do so due to her poor credit rating and low income. Therefore, Nick and Pat Hervonovich, friends or relatives of Connell, co-signed for the trailer. On May 25, 2004, Connell filed a complaint for palimony, distribution of assets, partition of the family home and other equitable relief.
In May 2004 Connell and Brian moved out of their family home, which by that time had no mortgage, and Brian began living with his fiancé. Connell and Diehl did not divide their household possessions. Connell testified that Diehl would not allow her take the furniture or appliances bought with her inheritance and that Diehl expected to keep everything. Connell was afraid of confrontation and knew that it would be unsuccessful, so she did not pursue the issue of dividing their possessions. Diehl took Connell to Home Depot, purchased some supplies for her and installed some light fixtures in the mobile home. Connell lived on her $762 monthly social security checks and food stamps, which did not cover her monthly expenses. Connell has no driver's license and must rely on public transportation and taxi cabs.

II.
After a three-day bench trial in August 2005, the Family Part judge made findings of fact and drew conclusions of law in a written opinion. The judge credited the testimony of Connell and her five witnesses, who have known the couple for the duration of their relationship. Each confirmed Connell's testimony that she and Diehl held themselves out as a married couple. Conversely, the judge found that Diehl's witnesses offered little information. The judge observed that Diehl's witnesses were either current or former tenants in Diehl's buildings or were paid by Diehl for various services. The judge also found that Diehl himself offered "little relevant or credible testimony . . . relating to the issues before this Court," although Diehl did refer to Brian as "our son" during his testimony, corroborating the existence of their family unit.
The judge concluded that Connell had adequately established the elements required in a palimony action. He found that Connell and Diehl cohabitated for thirty years, holding themselves out as husband and wife. Hence, a quasi-contract existed between the parties.
The Family Part judge found that Connell had not worked outside the home since 1974. He concluded
that other than Social Security and food stamps, [Diehl] was the sole support of [Connell] for thirty years and that they lived together in a relationship tantamount to marriage. [Connell] had a substantial basis to conclude that [Diehl] would take care of her for the rest of her life. The Court does conclude that there was no written or express contract, but the unequivocal conduct of the parties can require no other conclusion. There was a quasi-contract between the parties that [Diehl] would always take care of [Connell].
After finding that Connell had established the requisite elements to support an award of palimony, the Court calculated the amount thereof. The judge stated that, if there had been a legal marriage, Connell would be entitled to permanent alimony of $170 weekly in order to enable her to enjoy her former lifestyle with Diehl. Because Diehl's income was derived exclusively from investments, the judge concluded that Diehl would never *150 "retire." The judge determined that Diehl's life expectancy at the time of trial was almost eighteen years.
Because Diehl had not provided a Case Information Statement (CIS) at trial, the judge concluded that Diehl had not established that he could not afford $170 in weekly palimony. The judge also determined that Diehl had adequate assets to satisfy a palimony award. Based on defendant's life expectancy, the trial judge, using a 4.5% interest rate to determine a present-value lump-sum award, calculated a lump-sum palimony award of $107,494.40. The judge rejected Diehl's defenses that Connell had unclean hands in that she accepted food stamps while they lived together and that she was judicially estopped from claiming palimony because she did not disclose that claim on her bankruptcy petition.
Further, the judge found that Connell was entitled to a return of her $70,000 inheritance because after she gave that money to Diehl, "those funds were used solely by [Diehl] who alone has obtained the benefit of same." With respect to partition of their family home, the judge concluded:
In this case, the parties purchased the home together, although placing it, at [Diehl's] insistence, in his name alone. There was no real testimony as to the basis of the deposit. The Court does, however, conclude that this was the marital home and was selected by [Connell] and [Diehl] to be their home. [Connell] is entitled to get her $70,000 back. These funds clearly were hers and were provided to [Diehl] and invested in the family home in reliance upon the continuing relationship of the parties. (Emphasis added.)
Because the $70,000 portion of the judgment was a claim against the Lincoln Park home, the judge permitted Connell to file a lis pendens. Finally, the judge awarded counsel fees to Connell in the amount of $15,000 after reviewing the factors set forth in R. 5:3-5(c).

III.
In his brief on appeal, Diehl contends that the trial judge erred: (1) in ordering palimony because there was insufficient credible evidence to support such relief, (2) in ordering palimony because not all of the prima facie elements of a palimony action were established, (3) in permitting Connell to assert her Fifth Amendment privilege against self-incrimination and (4) in failing to bar Connell's palimony claim under the doctrine of judicial estoppel. In his supplemental brief on appeal, Diehl also asserts that the judge erred: (5) in assuming jurisdiction over Connell's claims because they were subject to the exclusive jurisdiction of the federal bankruptcy court, (6) in finding an implied contract between the parties, (7) in failing to enforce the settlement reached by the parties and (8) in failing to credit Diehl with $126,880.31 paid to Connell prior to trial.
In support of her cross-appeal, Connell asserts that the judge erred: (1) in calculating palimony based on Diehl's life expectancy rather than hers, (2) in failing to include all the usual expenditures in his calculations, (3) in failing to order a partition of the family home and (4) in failing to divide the personal property.

IV.
The scope of our appellate review of a Family-Part judgment following a bench trial is limited. Generally, we are required to disregard any error or omission "unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. Findings of fact by the trial court are generally binding on appeal if they are supported by adequate, substantial *151 and credible evidence. Rova Farms Resort Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). "[W]hen the evidence is largely testimonial and involves questions of credibility," deference is particularly appropriate. In re Return of Weapons to J.W.D., 149 N.J. 108, 117, 693 A.2d 92 (1997). A trial judge "has a better perspective than a reviewing court in evaluating the veracity of witnesses" because that judge observes the witnesses and hears them testify. Pascale v. Pascale, 113 N.J. 20, 33, 549 A.2d 782 (1988).
We may not disturb the "factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms, supra, 65 N.J. at 484, 323 A.2d 495. We may only "exercise [our] original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter." Ibid.
"Furthermore, matrimonial courts possess special expertise in the field of domestic relations." Cesare v. Cesare, 154 N.J. 394, 412, 713 A.2d 390 (1998) (citation omitted). Rule 5:1-2 provides that the jurisdiction of the Family Part extends to "[a]ll civil actions in which the principal claim is unique to and arises out of a family or family-type relationship." The Cesare Court instructed that "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare, supra, 154 N.J. at 413, 713 A.2d 390. However, no special deference is accorded a trial judge's interpretation of the law. Manalapan Realty v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.").

V.
With respect to the trial judge's fact-findings, Diehl contends that the judge ignored evidence establishing that the parties functioned as "separate economic entities" despite living together. Furthermore, Diehl asserts that the conclusion that he agreed to support Connell for the rest of her life was belied by the child support Connell received for Brian from his father and Diehl's sole ownership of his rental properties.
Although Connell and Diehl did have separate accounts, Connell was clearly not independent of Diehl. Rather, she depended on him almost entirely and devoted the small sums she received from Social Security to purchasing food for the family. They were hardly "separate economic entities." The fact that Connell received child support for Brian does not militate against a palimony action, nor does Diehl's sole ownership of the rental properties that he promised would provide for their joint retirement. Having reviewed the record in detail, we are more than satisfied that the judge's fact-findings were supported by "competent, relevant and reasonably credible evidence," giving due regard to his determinations of credibility. Rova Farms, supra, 65 N.J. at 484, 323 A.2d 495. As a result, we "accord deference to family court factfinding[s]," Cesare, supra, 154 N.J. at 413, 713 A.2d 390, and will not disturb them on appeal.

VI.
Next, Diehl contends that his "act in buying properties and keeping them in his own name contradicts the idea that he intended to provide future support for [Connell]." He urges that the facts were *152 akin to a joint venture rather than the type of relationship recognized in the leading palimony cases. Diehl argues that Connell did not prove that she had any expectation of remuneration for the services she performed and, as such, quasi-contractual liability should not have been found. He contends that the evidence merely "show[s] two individuals with separate economic interests who just happened to live together." These arguments are inconsistent with the facts of this case and the law of palimony in New Jersey.
An unmarried person has a well settled right to enforce her cohabitant's promise to support her for life. This right was initially established in Kozlowski v. Kozlowski, 80 N.J. 378, 403 A.2d 902 (1979). Plaintiff, whose name was Irma Kozlowski by virtue of her first marriage, began living with defendant Thaddeus Kozlowski in 1962 when she was forty-eight years old. Id. at 381, 383, 403 A.2d 902. She was still married to her first husband and was the mother of two children. Id. at 381, 403 A.2d 902. Defendant, who also had two children, was six years her junior. Ibid. They began living together about four months after they first met and cohabited with three of their four children in a marital-type relationship, which lasted for fifteen years. Ibid. Early during this relationship plaintiff divorced her husband. Id. at 383, 403 A.2d 902. Over time defendant became increasingly wealthy, although he kept his business affairs to himself. Id. at 381, 403 A.2d 902. Plaintiff depended on defendant for all of her needs, maintenance and support. Ibid. She took care of their house, acted as a mother to their children, and acted as a hostess for defendant's business associates and customers, who took her to be his wife. Id. at 382, 403 A.2d 902.
In 1968 they separated, apparently as a result of defendant's failure to get a divorce. Id. at 382, 384, 403 A.2d 902. Within a week defendant begged plaintiff to return and promised to take care of her and provide for her. Id. at 382, 403 A.2d 902. She asked if he would divorce and he said no. Ibid. He declared "that a marriage license is only a piece of paper and that `it's what is in the heart that really counts.'" Ibid. Plaintiff returned and lived with defendant until July 1977 when it became obvious that defendant had another romantic relationship with a person thirty years junior to him, whom he married after separating from plaintiff and divorcing his wife. Ibid.
The trial judge rejected defendant's testimony based on his demeanor on the witness stand, rejected his counsel's characterization of defendant as a sensitive man and found that his testimony was not believable. Id. at 384, 403 A.2d 902. He concluded,
I'm perfectly satisfied that he did promise to take care of her the rest of her life as she testified. I find also that when she indicated concern about what would happen to her if he died first, he reassured her by telling her he would see that she was taken care of, and again I find that as a fact.
[Id. at 384-85, 403 A.2d 902.]
The Supreme Court held that "[s]uch agreements by adult nonmarital partners which are not explicitly and inseparably founded on sexual services are enforceable." Id. at 385, 403 A.2d 902 (citations omitted). Finding that "there was no legal impediment to the parties cohabiting in 1968," the Court concluded that "any lawful agreement made by them is enforceable." Id. at 387, 403 A.2d 902.
Three years later, in Crowe v. De Gioia, 90 N.J. 126, 129, 447 A.2d 173 (1982) (Crowe I), the Supreme Court determined that temporary relief pending the outcome *153 of the trial was available in a palimony action. And Crowe v. De Gioia, 203 N.J.Super. 22, 31, 495 A.2d 889 (App.Div. 1985), aff'd o.b., 102 N.J. 50, 505 A.2d 591 (1986) (Crowe II), held that "the amount and sufficiency of consideration is not significant, so long as it is the bargained for detriment actually intended as such between the parties." Ibid. We concluded that the detriment was not required to be equal to the benefit. Ibid.
More recently, we concluded that there was no requirement that a palimony claimant show "`almost complete dependency'" on the cohabitant or prove that the cohabitant had "`tossed aside' the other unfairly." In re Estate of Roccamonte, 346 N.J.Super. 107, 119-20, 787 A.2d 198 (App.Div.2001) (concluding that a palimony claim for damages survives the death of the promissor), aff'd, 174 N.J. 381, 808 A.2d 838 (2002). In affirming our judgment, the Supreme Court defined a marital-type relationship as "the undertaking of a way of life in which two people commit to each other, foregoing other liaisons and opportunities, doing for each other whatever each is capable of doing, providing companionship, and fulfilling each other's needs, financial, emotional, physical, and social, as best as they are able." In re Estate of Roccamonte, 174 N.J. 381, 392, 808 A.2d 838 (2002). The Court also rejected the notion that complete dependence must be shown before relief may be granted. Id. at 393, 808 A.2d 838. Rather, the Court held that "[t]he issue is . . . one of economic inequality, and the relevant question is whether the promisee is self-sufficient enough to provide for herself with a reasonable degree of economic comfort appropriate in the circumstances." Ibid.
We again addressed the elements of a palimony claim in Levine v. Konvitz, 383 N.J.Super. 1, 3, 890 A.2d 354 (App.Div. 2006), certif. denied, 186 N.J. 607, 897 A.2d 1061 (2006). We noted:
In order to establish a prima facie case for palimony, a plaintiff must present competent evidence showing: (1) that the parties cohabitated; (2) in a marriage-type relationship; (3) that, during this period of cohabitation, defendant promised plaintiff that he/she would support him/her for life; and (4) that this promise was made in exchange for valid consideration.
[Ibid.]
Of course, a critical element of a palimony claim is cohabitation for a significant period of time and a failure to prove a significant cohabitation in a marital-type relationship is fatal. McDonald v. Estate of Mavety, 383 N.J.Super. 347, 360-61, 891 A.2d 1218 (App.Div.), certif. denied, 187 N.J. 79, 899 A.2d 302 (2006); Levine, supra, 383 N.J.Super. at 2, 890 A.2d 354.
In this case, it is undisputed that Connell and Diehl cohabitated for thirty years, a significant period of time, without separation in a marital-type relationship. Diehl told Connell that they would tell everyone that they were married, that they would always be together, that the relationship would be just like marriage and that therefore legal marriage was not necessary. Diehl clearly induced her to cohabitate with him, promising that it would be just like marriage. In fact, Diehl always presented the parties as a married couple, and Connell always referred to herself as Mrs. Pojedneck and then Mrs. Diehl. Diehl even referred to Brian during his testimony as his own son. Connell presented numerous witnesses who testified that they were always under the impression that the two were married. Diehl and Connell attended all types of family functions and the invitations were always addressed to Mr. and Mrs. Diehl. Thus, the first two prongs of a palimony cause of *154 action have been established beyond peradventure.
As to the third prong, the judge found that an implied contract existed. This conclusion is clearly supported by the record. Diehl knew that Connell was totally disabled due to her functional blindness. He promised he would never abandon her and he provided for all her financial needs for thirty years. He referred to the home he purchased as "our house," and left her seventy-five percent of his real and personal property in one of his wills. He later made further provision for Connell for the balance of her life by leaving his entire estate to her, including all the rental properties that he said would provide for their retirement. The fact that he took legal title to those properties in his name alone is not determinative because in equitable suits such as this the court must evaluate the parties' conduct in light of all the surrounding circumstances and not on one fact alone. Crowe II, supra, 203 N.J.Super. at 34, 495 A.2d 889.
As to the fourth prong, Connell provided ample consideration through her services as a housewife, cooking, cleaning, doing laundry and otherwise providing for Diehl's needs. Additionally, she worked in Diehl's various business endeavors without any wages for her efforts and this, too, was consideration for Diehl's promise to provide for her for her life. Connell was not required to prove that she expected any remuneration for the tasks she performed.

VII.
After carefully reviewing the record in the light of the written arguments advanced by the parties, we conclude that the issues presented by Diehl relating to Connell's invocation of her fifth amendment privilege on cross-examination respecting her receipt of food stamps and the effect of Connell's bankruptcy are without sufficient merit to warrant extensive discussion in this opinion, R. 2:11-3(e)(1)(E). We note only that the parties continued to cohabit throughout the pendency of the bankruptcy proceedings and no claim for palimony accrued until Diehl breached his implied promise of lifetime support. Reid v. Reid, 310 N.J.Super. 12, 708 A.2d 74 (App.Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998), does not require a different result because there a divorce proceeding was pending at the time of the bankruptcy.

VIII.
A dependent person is entitled to an award of damages for breach of an agreement to provide lifetime support. The Kozlowski Court addressed the issue of damages, first noting that "[p]laintiff is not entitled to alimony or equitable distribution [because a]limony may be awarded only in actions for divorce or nullity, and equitable distribution is awarded only in actions for divorce." Kozlowski, supra, 80 N.J. at 383, 403 A.2d 902 (citing N.J.S.A. 2A:34-23, et seq.) The Court then held:
While the damages flowing from defendant's breach of contract are not ascertainable with exactitude, such is not a bar to relief. Where a wrong has been committed, and it is certain that damages have resulted, mere uncertainty as to the amount will not preclude recovery  courts will fashion a remedy even though the proof on damages is inexact. Accordingly, plaintiff is entitled to a onetime lump sum judgment in an amount predicated upon the present value of the reasonable future support defendant promised to provide, to be computed by reference to her life expectancy as shown by the tables referred to in R. 1:13-5.

*155 [Id. at 388, 403 A.2d 902 (citations omitted) (emphasis added).]
Accord Roccamonte, supra, 174 N.J. at 397, 808 A.2d 838 ("[I]t is the promisee's life that is, in effect, the measuring life."); Crowe I, supra, 90 N.J. at 129, 447 A.2d 173.
The determination of a lump-sum palimony award required the trial judge to perform three calculations. First, the judge was required to determine the reasonable future support Diehl promised to provide. Kozlowski, supra, 80 N.J. at 388, 403 A.2d 902. That amount is to be calculated on a weekly or monthly basis. Second, the judge was required to determine the duration of future support. Third, the judge was required to reduce that period of annual future support to a present value lump sum. We have consistently applied the Kozlowski formula. See McDonald, supra, 383 N.J.Super. at 347, 891 A.2d 1218 (awarding a one-time lump sum calculated on the basis of the promisee's lifetime); In re Estate of Sasson, 387 N.J.Super. 459, 467, 904 A.2d 769 (App.Div.), certif. denied, 189 N.J. 103, 912 A.2d 1263 (2006) (finding that the appropriate palimony award is a one-time lump sum calculated on the basis of the promisee's lifetime); Maksuta v. Higson, 242 N.J.Super. 452, 577 A.2d 185 (App.Div.1990) (following the Kozlowski formula in the determination of palimony).
Connell contends that the judge erred in two respects. First, Connell asserts that the judge erred in determining reasonable future support because he did not consider all of the requisite elements of future support. Second, she asserts that he erred in using Diehl's life expectancy of 17.88 years as the duration of future support. Beginning with the second point, Connell correctly asserts that the trial judge erred when he used Diehl's life expectancy as a measure of a lumpsum palimony award. It is abundantly clear from Supreme Court decisions that the judge was required to use Connell's life expectancy of 22.52 years in determining the duration of support. Roccamonte, supra, 174 N.J. at 397, 808 A.2d 838; Crowe I, supra, 90 N.J. at 129, 447 A.2d 173; Kozlowski, supra, 80 N.J. at 388, 403 A.2d 902. As a consequence, the lumpsum award must be recalculated.
With respect to the first alleged error, in our review of palimony awards the determination of the promisee's needs in order to maintain her lifestyle is within the sound discretion of the trial judge and should only be reversed if it constitutes an abuse of discretion. Crowe, supra, 203 N.J.Super. at 35-36, 495 A.2d 889; see, e.g., Martindell v. Martindell, 21 N.J. 341, 122 A.2d 352 (1956). The Court stated that the award of weekly support "should provide her with her minimal needs and prevent the necessity of her seeking public welfare." Crowe I, supra, 90 N.J. at 136, 447 A.2d 173; see also Roccamonte, supra, 174 N.J. at 395, 808 A.2d 838 (finding that while the couple lived lavishly during their cohabitation, it is highly unlikely that the intent was for the promisee to become impoverished; therefore, a palimony award for adequate support is reasonable).
The judge determined that a budget of $1812 contained in Connell's CIS marked P-1 in evidence was generally consistent with the lifestyle of the marriage. He deducted the $100 for vacations on the CIS and also deducted $100 for savings because those sums "were not part of the lifestyle to any degree." He then deducted Connell's Social Security benefits of $702 and her food stamps of $128 to arrive at a monthly shortfall of $722.
Connell's CIS in the appendix prepared by Diehl is dated October 6, 2004, and it reflects a monthly budget of $2691, not *156 $1812, and does not contain any sums for vacations or savings. It may be that Diehl included the wrong CIS in his appendix, but we cannot resolve the discrepancy between Connell's October 6, 2004, CIS and the judge's findings. We also note that Connell testified to various expenses which are not reflected in her October 6, 2004, CIS, such as ground rent for the trailer park and sewer charges, and we do not know if they were set forth in P-1. Furthermore, Connell's testimony as to other expenses differed from the amounts on the October 6, 2004, CIS.
We find no error in the exercise of the judge's discretion in using Connell's post-separation lifestyle as the basis for a palimony award, so long as the quantum of support was reasonably adequate and did not leave Connell reliant on public assistance, such as food stamps. The case law does not require that Connell be able to live just as before. Rather, the award need only provide reasonable support sufficient to meet "her minimal needs and prevent the necessity of her seeking public welfare." Crowe I, supra, 90 N.J. at 135, 447 A.2d 173 (emphasis added).[1] It is not clear that $170 per week accomplishes that goal.
Furthermore, the judge made no findings with respect to the effect of potential liability for payment of state and federal income taxes, nor has the matter been adequately briefed on appeal. It is not clear whether a lump-sum palimony award such as in this case is subject to taxation. See, e.g., United States v. Harris, 942 F.2d 1125, 1134 (7th Cir.1991) ("It is also worth noting that [the concurring judge's] argument has no application to the case of Green v. Commissioner, T.C. Memo 1987-503, which . . . suggests that Marvin-type palimony payments are not taxable income as a matter of law.") Furthermore, the judge did not consider the effect of inflation in calculating the present value of future support. See, e.g., Model Jury Charge (Civil), § 8.11(c).
We are thus constrained to remand the issue of reasonable support to the trial judge for recalculation in accordance with this opinion in light of the applicable case law. Because Diehl promised that the rental properties were going to provide for their retirement, the judge must consider them as a source for support. He must determine Connell's need for reasonable support and explain how he arrives at an amount. On remand the judge must make specific fact findings with respect to each expense and determine a reasonable amount of support. He must employ Connell's life expectancy in calculating a lump sum and must consider the potential effects of interest, inflation and taxes in his award.

IX.
Connell asserts that the trial judge erred when he did not order a partition of the family home and a division of the personal property in that home. Specifically she argues that the home was a joint venture, as they referred to the family home as "our home;" that Diehl left the home to Connell in his will; and that Connell invested her $70,000 inheritance in the home.
Generally, a mere promise to provide lifetime support does not extend to a claim against assets owned solely by the promissor. Crowe II, supra, 203 N.J.Super. at 37, 495 A.2d 889; accord Olson v. Stevens, 322 N.J.Super. 119, 123, 730 A.2d 432 (App.Div.1999). However, unmarried cohabitating persons "who have engaged in a joint venture to purchase property in *157 which they reside, are entitled to seek a partition." Mitchell v. Oksienik, 380 N.J.Super. 119, 127, 880 A.2d 1194 (App. Div.2005); see also Olson, supra, 322 N.J.Super. at 123, 730 A.2d 432. Joint venturers are entitled to seek a partition of their property when their joint enterprise comes to an end. Mitchell, supra, 380 N.J.Super. at 127, 880 A.2d 1194; see Swartz v. Becker, 246 N.J.Super. 406, 410-11, 587 A.2d 1295 (App.Div.1991).
Further, we have stated that the fact that the purchase of property under one unmarried cohabitant's name "is essentially irrelevant to an equitable action." Crowe, supra, 203 N.J.Super. at 34, 495 A.2d 889. In Mitchell we rejected a promissor's argument that taking title to real property in his name only showed that he had no intention of conveying such property to his former cohabitant because the record was full of evidence suggesting the promisor considered the home to be the couple's home. Mitchell, supra, 380 N.J.Super. at 130, 880 A.2d 1194.
In this case, the trial court found that:
[T]he parties purchased the home together, although placing it at [Diehl's] insistence, in his name alone. There was no real testimony as to the basis of the deposit. The Court does, however, conclude that this was the marital home and was selected by plaintiff and defendant to be their home.
The court also considered Diehl's former will, which made Connell his sole inheritor, which would of necessity have included the family home. Additionally, we note that Connell invested a significant sum, her entire inheritance from her mother, into remodeling and furnishing the home as well as decorating it. These facts were certainly relevant to the issue of a joint venture, but the judge did not explain why he was not persuaded that one existed. He must address this issue on remand and its impact on the other economic issues to be addressed.
If the judge finds that a joint venture existed, he must partition the home. If he concludes otherwise, a mere return of Connell's investment is not equitable. The judge must determine the present value of $70,000 as though it had been invested in some reasonable manner, such as certificates of deposit. Alternatively, he may determine its present value based on the appreciation in the value of the family home since it was remodeled. Otherwise, Diehl will have enjoyed the use of Connell's money without recompense. This rationale applies equally to division of the personal property in the family home. At the very least, Connell is entitled to the return of personal property she purchased with her inheritance. This issue must be considered on remand.

X.
Finally, Diehl asserts that the trial judge erred when he refused to enforce an alleged settlement agreement that he contends the parties made. Diehl also urges that the judge failed to credit him with monies that he provided to Connell before trial. The settlement agreement was a disputed issue of fact; Connell testified that no settlement had been reached. We defer to the Family Part judge's rejection of Diehl's testimony regarding the alleged settlement. Cesare, supra, 154 N.J. at 413, 713 A.2d 390. However, as to the monies given by Diehl to Connell in 2004 as a down payment on a trailer and any monies voluntarily provided to her thereafter, the judge is to determine whether Diehl is entitled to a credit against either palimony or a distribution of assets.
Affirmed in part and reversed and remanded in part for proceedings consistent *158 with this opinion. We do not retain jurisdiction.
NOTES
[1] It is not clear yet that Connell does not need public welfare.